**STATE of Tennessee, Appellee,**

v.

**Karen R. HOWELL, Natasha W. Cornett, Jason B. Bryant, Edward D. Mullins, Joseph L. Risner, and Crystal R. Sturgill, Appellants.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 29, 2000.

486

David L. Leonard, Leonard & Kershaw, Greeneville, TN, for appellant Howell.

Stacy L. Street, Hampton & Street, Elizabethton, TN, for appellant Cornett.

Robert J. Jessee, Johnson City, TN, for appellant Bryant.

Stephen W. Owens, Pikeville, KY, Gerald Eidson, Rogersville, TN, for appellant Mullins.

Mark D. Slagle, Johnson City, TN, and T. Wood Smith, Greeneville, TN, for appellant Risner.

Greg W. Eichelman, and Michael A. Walcher, Office of the Public Defender, Morristown, TN, for appellant Sturgill.

Paul G. Summers, Attorney General and Reporter, Kathy Morante, Deputy Attorney General, Criminal Justice Division, Nashville, TN, C. Berkeley Bell, District Attorney General, Cecil C. Mills, Jr., Assistant District Attorney General, and Eric D. Christiansen, Assistant District Attorney General, Greeneville, TN, for appellee.

## OPINION

GARY R. WADE, Presiding Judge.

The defendants, Karen Howell, Natasha Cornett, Crystal Sturgill, Joseph Risner, Jason Bryant, and Dean Mullins, entered pleas of guilt to the attempted murder of Peter Lillelid and the first degree murders of Vidar, Delfina, and Tabitha Lillelid.[1] In exchange for the pleas of guilt, the state agreed to withdraw its requests for imposition of the death penalty. Each defendant waived the right to trial by jury and the trial court conducted a consolidated sentencing hearing. At the conclusion of the proceeding, the trial court sentenced each defendant to life in prison without the possibility of parole for each of the three

---

1. In addition to the three counts of first degree murder and the count of attempted murder, each defendant pled guilty to two counts of especially aggravated kidnapping, two counts of kidnapping, and one count of theft of property valued between $1,000 $10,000. The trial court imposed concurrent sentences for each defendant as follows:

especially aggravated kidnapping, 25 years;
especially aggravated kidnapping, 25 years;
aggravated kidnapping, 12 years;
aggravated kidnapping, 12 years; and
theft of property, 4 years.

The defendants have not sought appellate review of any issues relating to those convictions.

first degree murder convictions and twenty-five years for the attempted murder conviction. The trial court ordered each sentence to be served consecutively.

In this appeal of right, each defendant challenges the application of the aggravating and mitigating circumstances and questions the propriety of consecutive sentencing. The defendants Karen Howell and Natasha Cornett contend that the trial court erred by failing to grant separate sentencing hearings. Howell has adopted the allegations of error made by the other defendants. Crystal Sturgill contends that the trial court should have granted a severance of her sentencing hearing and also argues that the trial court erred by vicariously applying aggravating circumstances to her. Joseph Risner contends that the trial court erred by applying nonstatutory aggravating circumstances; he also adopted the issues presented by the other defendants. Jason Bryant, a juvenile, asserts that the trial court erred by imposing a life sentence without the possibility of parole in violation of Tenn.Code Ann. § 37-1-134, which sets out the procedure for transfer from juvenile court. Dean Mullins contends that the trial court erred by failing to grant separate sentencing hearings for the six defendants and by vicariously applying aggravating circumstances to him in arriving at the maximum sentence. He also maintains that the state improperly sought the death penalty in violation of an agreement between him and the state.

We affirm the sentences imposed by the trial court as to defendants Howell, Cornett, Bryant, Mullins, and Risner. Due to her involvement in the crimes, but because of the significant difference between the level of her participation and that of the other defendants, the sentence of the defendant Sturgill is modified to three concurrent terms of life imprisonment without the possibility of parole; the twenty-five year sentences for attempted first degree murder shall be served consecutively as to all defendants except Sturgill.

Each of the six defendants was indicted for three counts of first degree murder, one count of attempted first degree murder, two counts of especially aggravated kidnaping, two counts of aggravated kidnaping, and one count of theft of property valued over $1,000. The charges stemmed from the April 6, 1997, murder of Vidar Lillelid (34) and Delfina Lillelid (28), the murder of their six-year-old daughter, Tabitha Lillelid, and the attempted murder of their two-year-old son, Peter Lillelid. The crimes were committed near a rest stop in Greene County, Tennessee.

The defendants were en route from their homes in Pikeville, Kentucky, to New Orleans, Louisiana. Before leaving Kentucky, they had acquired two guns, a 9mm and a .25 caliber pistol. Shortly after their departure, they realized that their car, which belonged to Joseph Risner, would not likely sustain the length of the trip. They discussed the possibility of stealing a car from a parking lot or a dealership before meeting the Lillelids, who were returning to their residence from a religious convention, at a rest stop on Interstate 81 near Greeneville.

Vidar Lillelid, who was an active Jehovah's Witness, approached Cornett and Howell at the rest stop in order to discuss his religious views. He was accompanied by his son, Peter. Eventually, Risner and Bryant joined the conversation. Meanwhile, Mrs. Lillelid and her daughter, Tabitha, were seated at a nearby picnic table. After a time, Risner, Bryant, Howell, and Cornett joined the entire Lillelid family and continued their conversation. At some point, Risner displayed one of the guns and said, "I hate to do you this way, but we are going to have to take you with us for your van." As he then directed the Lillelid family into their van, Vidar Lillelid pleaded with the group, offering his keys and wallet in exchange for permission to remain at the rest stop. Risner refused.

Vidar Lillelid drove the van while Risner, still armed, sat in the passenger seat.

Risner, Bryant, Howell, and Cornett were in the van with the Lillelids. Mullins and Sturgill followed in Risner's car. In an attempt to calm the children, Delfina Lillelid began to sing. Bryant purportedly ordered her to stop. Risner directed Mr. Lillelid first to the interstate and then to a secluded road at the next exit.

What happened thereafter is in dispute. The accounts given by Risner, Cornett, Howell, Mullins, and Sturgill are consistent, except for minor discrepancies. They claim that Bryant began to take charge of the situation once Risner ordered the van to a stop. Risner, who was in possession of the 9mm weapon, contends that he handed the gun to Cornett at that point, explaining that he could not continue. Cornett maintains that she placed the weapon on the floor of the van while Bryant, who had the .25 caliber gun, ordered the Lillelids to stand in front of a ditch. According to all but Bryant, the Lillelids pleaded for their lives and especially for the lives of their children, promising that they would not call the authorities. The other defendants contend that when Bryant refused, Cornett and Howell then pleaded with Bryant to let the Lillelids go. According to the other defendants, Bryant again refused, explaining that the Lillelids would likely call the police. When Bryant promised that he would not hurt the children, Howell and Cornett testified that they returned to the van, where Risner had remained. They then heard a rapid succession of gunshots. Some claim that Mr. Lillelid was the first to be shot, while others say that it was Mrs. Lillelid. All contend that when the shooting stopped, Bryant returned to the van, and said, "They're still f—ing alive." He then grabbed the other gun and fired another round of shots. Bryant, they said, laughed and bragged about the shootings. After the shootings, Risner went to his car and removed the license plate and registration from his vehicle. Risner claims that he accidentally struck one or more of the bodies when, in response to an order from Bryant, he turned the van around. They

each claim that Sturgill and Mullins remained in Risner's car throughout the entire episode.

At the sentencing hearing, Bryant testified that it was Risner who ordered the Lillelids out of the van and directed them to stand by a ditch. He contended that Risner first shot Vidar Lillelid with the .25 caliber weapon and then slapped Mullins on the shoulder, and that Mullins also shot at the victims. Bryant claimed that he kept his eyes closed during the shootings and that he never fired either weapon. Bryant contended that Mullins and Risner ordered the others into the van after the shootings. The defendants then drove the Lillelids' van to a gas station where they purchased a road map. They stopped at a Waffle House while traveling through Georgia but left the restaurant when a group of police officers arrived. They decided to abandon their plans to travel to New Orleans and instead drove toward Mexico. When they reached the border, they were initially denied admittance because they did not have the proper forms of identification but eventually found a way into the country. While in Mexico, Bryant was shot in the hand and leg. The source of the wound is disputed by the defendants. Bryant testified that Risner asked him to take the blame for the shootings because Bryant was a juvenile. He claimed that when he hesitated, Risner shot him in the hand and in the leg. The other defendants asserted that Bryant's wounds were self-inflicted.

Later, the defendants were stopped by the Mexican authorities. When they claimed they were lost, the officers ordered the defendants out of the van and conducted a search. When they found a knife and a photo album belonging to the Lillelid family, they ordered the defendants to the border to re-enter the United States. American officers searched the defendants at the border patrol and took them to an Arizona jail. At the time of their arrest, several of the defendants had

in their possession personal items belonging to the victims.

Upon their return to Tennessee, the state filed formal charges and provided notice seeking the death penalty for each defendant, except for Howell and Bryant, who were juveniles at the time of the commission of the crime. In exchange for withdrawal of the requests for the death penalty, Cornett, Risner, Mullins, and Sturgill pled guilty to three counts of first degree murder and one count of attempted first degree murder. Juveniles Howell and Bryant also entered pleas of guilt to the same charges.

The sentencing hearing, conducted in February of 1998, lasted one week. All of the defendants testified at the hearing, with the exception of Mullins and Sturgill.

Dr. Cleland Blake, a forensic pathologist, testified to the extent of the victims' injuries. Vidar Lillelid, age 34, received a total of six gunshot wounds, one to the right side of his head and five to his chest. In Dr. Blake's opinion, the first shot entered the victim's right eye, traveled through his temple, and exited in front of his right ear. While he could not be certain, it was Dr. Blake's opinion that this shot was fired by a 9mm handgun and would have caused a loss of consciousness. Dr. Blake believed that the victim fell to the ground and was shot three times in the upper right side of his chest. He described the shots as consistent with a 9mm. It was Dr. Blake's opinion that the three gunshot wounds to the chest were deliberately fired in order to form the shape of an equilateral triangle and that the victim was lying on his back at the time. A gunshot wound just below Mr. Lillelid's nipple was consistent with a .25 caliber weapon. A final 9mm gunshot wound was located just beneath the .25 caliber wound. There was a "graze laceration" on the victim's right forearm where a bullet skimmed across the surface of his arm. A span of approximately 23 centimeters divided the five chest wounds. All of the wounds were grouped along the right side of the body. There were postmortem superficial abrasions to the back of the victim's legs. Dr. Blake believed that the victim most likely died within a few minutes of the initial gunshot to his right eye.

Delfina Lillelid, age 28, was shot eight times. All eight bullets were recovered; six were from a 9mm and two were from a .25 caliber. In Dr. Blake's opinion, the first of these shots, fired by a 9mm, shattered the bone in her left arm. The second shot, also from a 9mm, shattered the thigh of her left leg. Dr. Blake testified that these shots would have caused severe pain, but would not have produced her death. Dr. Blake believed that the victim would not have been able to stand after these wounds were inflicted. Mrs. Lillelid was shot six additional times while she lay on her back. The first three shots struck the left side of her abdomen. It was Dr. Blake's opinion that these shots were fired to form a triangular pattern, similar to the injuries inflicted on Mr. Lillelid. The three shots pierced her stomach, leaving a four- to five-inch tear, and traveled through her pancreas, spleen, left kidney, and left adrenal. A final 9mm entry wound was located at the mid-section of Mrs. Lillelid's abdomen just above her navel and was recovered from her vertebrae. There was a .25 caliber gunshot wound under her left armpit; the bullet lodged in the skin on the back of her left shoulder. A .25 caliber weapon also caused a wound to Mrs. Lillelid's left side. The bullet was recovered from the center of her liver. She also suffered abrasions on her right calf. Dr. Blake testified that Mrs. Lillelid's wounds were not immediately fatal and that she could have been conscious for as long as 25 minutes, including when her body was driven over by the van.

Six-year-old Tabitha Lillelid was shot once in the head by a small caliber weapon. The bullet entered her head on the left side, traveled downward, and exited behind her right ear, causing immediate brain death. Her organs continued to

function through the use of life support until her uncle, who had been named her custodian, gave permission for the donation of several of her internal organs. Physicians harvested her heart, liver, gallbladder, kidneys, pancreas, spleen, and adrenals. She was pronounced dead one day after the shootings.

Two-year-old Peter Lillelid was shot twice with a small caliber weapon. One shot entered behind his right ear and exited near his right eye. A second gunshot penetrated his body from the back and exited through his chest. He was transported to the pediatric intensive care unit at the University of Tennessee Memorial Hospital by a Lifestar helicopter and was listed in critical condition. He required vigorous resuscitation. There was a contusion to his right lung and some residual bleeding in his right chest cavity. Eleven days after the shootings, doctors removed the damaged eye. He remained in the hospital for 17 days before being transferred to a rehabilitation center in Knoxville.

With regard to the first degree murder of Vidar Lillelid, the trial court found the two following aggravating circumstances applicable to each of the six defendants:

(1) the murder was committed for the purpose of avoiding, interfering with, or preventing arrest or prosecution, Tenn. Code Ann. § 39–13–204(i)(6); and

(2) the defendants committed "mass murder," Tenn.Code Ann. § 39–13–204(i)(12).

The trial court concluded that these two aggravating circumstances also applied to the murder of Delfina Lillelid. A third aggravating circumstance was also found to be present: Her murder was "especially heinous, atrocious or cruel" because of the "torture and abuse ... on the way to [the] murder, when [the victims] were crying and begging, pleading and singing" and because Mrs. Lillelid "cried and begged and pleaded before she was killed, at least for her children ... and then was [deliber-

ately] run over while she was still alive." Tenn.Code Ann. § 39–13–204(i)(5).

With respect to the murder of Tabitha Lillelid, the trial court applied three aggravating circumstances to all six defendants:

(1) the defendants committed "mass murder," Tenn.Code Ann. § 39–13–204(i)(12);

(2) the murder was especially heinous, atrocious, or cruel, Tenn .Code Ann. § 39–13–204(i)(5); and

(3) the murder was committed for the purpose of avoiding, interfering with, or preventing arrest or prosecution, Tenn. Code Ann. § 39–13–204(i)(6).

The trial court reasoned that the murder of Tabitha Lillelid was "especially heinous, atrocious, or cruel" because she "saw her parents shot and fall to the ground." As to the defendants Risner, Mullins, Sturgill, and Cornett, the trial court found a fourth aggravating circumstance, Tenn.Code Ann. § 39–13–204(i)(1), applicable to the murder of Tabitha Lillelid because she was under the age of twelve and the defendants Risner, Mullins, Sturgill, and Cornett were at least eighteen. Because Bryant (14) and Howell (17) were under the age of eighteen, this aggravating circumstance was not applicable to them.

The trial court found the following statutory enhancement factors applicable to each of the defendants as to the attempted murder of Peter Lillelid:

(1) the victim of the offense was particularly vulnerable because of age, Tenn. Code Ann. § 40–35–114(4);

(2) the victim was treated with exceptional cruelty during the commission of the offense, Tenn.Code Ann. § 40–35–114(5); and

(3) a firearm was used during the commission of the offense, Tenn.Code Ann. § 40–35–114(9).

The trial court imposed the maximum possible sentence upon each of the defendants: Twenty-five years for the attempted murder of Peter Lillelid and life sen-

tences without the possibility of parole for each of the three first degree murder convictions. The trial court ordered that all four sentences be served consecutively, finding each defendant to be a dangerous offender, having little regard for human life within the meaning of Tenn.Code Ann. § 40–35–115(4).

### Applicable Law

All issues presented by the defendants can be broadly categorized as either severance questions, primarily procedural, or sentencing questions, procedural and substantive. All possible sentencing issues collectively raised have been treated as if raised by each defendant.

### (1)

■ Different standards apply to the severance of multiple offenses for a single defendant and the severance of defendants which the state seeks to try together. *See generally State v. Shirley*, 6 S.W.3d 243 (Tenn.1999); *State v. Moore*, 6 S.W.3d 235 (Tenn.1999); Tenn.R.Crim.P. 14; Neil P. Cohen, *et al., Tennessee Law of Evidence*, § 404.11.

Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure govern when defendants may be tried together. Rule 8(c) provides that "two or more defendants may be joined in the same indictment, presentment, or information . . . if, among other things, each of the defendants is charged with accountability for each offense included. . . ." Rule 13(a) of the Tennessee Rules of Criminal Procedure provides that courts "may order consolidation of two or more indictments . . . for trial if the offenses and all defendants could have been joined in a single indictment . . . pursuant to Rule 8."

The Tennessee Rules of Criminal Procedure provide that a trial court should grant a severance of defendants if:

 (i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropri-

ate to promote a fair determination of the guilt or innocence of one or more defendants; or

 (ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn.R.Crim. P. 14(c)(2)(i)-(ii).

■ Whether or not to grant a severance is a matter which rests within the sound discretion of the trial court. *State v. Coleman*, 619 S.W.2d 112 (Tenn.1981). The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant. *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim.App.1982). Similarly, the state is entitled to have the guilt determined and punishment assessed in a single trial where two or more persons are charged jointly with a single crime, unless to do so would unfairly prejudice the rights of the defendants. *Brady v. State*, 584 S.W.2d 245 (Tenn.Crim.App.1979).

■ This court cannot interfere with the exercise of the discretion afforded the trial court absent clear abuse. *Coleman*, 619 S.W.2d at 116. Disparity in the evidence against the defendants is not alone sufficient to warrant the grant of a severance. *State v. Charles Haynes*, No. 01–C–019106–CC–00169, 1992 WL 146753 (Tenn. Crim.App., at Nashville, June 30, 1982).

### (2)

■ When there is a challenge to the length, range, or manner of the service of a sentence for an offense other than first degree murder, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991);

*see State v. Jones,* 883 S.W.2d 597 (Tenn. 1994). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. If the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn.Crim.App.1991).

■ Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant on his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, 103, and 210; *State v. Smith,* 735 S.W.2d 859, 863 (Tenn.Crim.App.1987).

In calculating the sentence for a conviction for a felony committed before July 1, 1995, the presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40–35–210(c) (1990) (amended July 1, 1995, to provide that the presumptive sentence for a Class A felony is the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn.Code Ann. § 40–35–210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn.Code Ann. § 40–35–210. The sentence may then be reduced within the range by any weight assigned to the mitigating factors presented.

Before the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in *Gray v. State,* 538 S.W.2d 391, 393 (Tenn.1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in *State v. Taylor,* 739 S.W.2d 227 (Tenn.1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed ... and ... the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn.Code Ann. § 40–35–115. The 1989 act is, in essence, the codification of the holdings in *Gray* and *Taylor;* consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria [2] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

**2.** The first four criteria are found in *Gray.* A fifth category in *Gray,* based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. *See* Tenn.Code Ann. § 40–35–115, Sentencing Commission Comments.

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical, and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn.Code Ann. § 40–35–115(b).

 The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn.Code Ann. § 40–35–102(1), and "no greater than that deserved" under the circumstances, Tenn.Code Ann. § 40–35–103(2); *State v. Lane*, 3 S.W.3d 456 (Tenn.1999).

In *Gray,* our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In *State v. Wilkerson,* 905 S.W.2d 933, 938 (Tenn.1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[ ] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The *Wilkerson* decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in *State v. Woods,* 814 S.W.2d 378, 380 (Tenn.Crim. App.1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." *Wilkerson,* 905 S.W.2d at 938.

When a non-juvenile defendant is convicted of first degree murder in a case in which the state is seeking the death penalty, three sentencing options exist: life imprisonment, life imprisonment without the possibility of parole, or death. Tenn.Code Ann. § 39–13–204 (1997 Repl.). A life sentence is mandatory if, at the conclusion of the sentencing hearing, the finder of fact concludes that the state has not proven any statutory aggravating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(f)(1) (1997 Repl.). A death sentence is appropriate if the finder of fact concludes that the state has proved at least one or more statutory aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(g)(1) (1997 Repl.). If the finder of fact determines that the state has proven one or more statutory aggravating circumstances, but concludes that the circumstances do not outweigh mitigating circumstances beyond a reasonable doubt, a sentence of either life imprisonment or life imprisonment without the possibility of parole may be imposed. Tenn.Code Ann. § 39–13–204(f)(2) (1997 Repl.). In determining which sentence to impose, the statute directs that the fact finder must "weigh and consider the aggravating and mitigating circumstances." *Id.* The statute does not require the finder of fact to determine that the aggravating circumstances outweigh the mitigating circumstances by any specific level of proof in order to impose a sentence of life imprisonment without the possibility of parole. *Id.*

In recognition of the substantial discretion afforded the finder of fact in determining which sentence to impose, the statute governing appellate review declares that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39–13–204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of ... discretion." Tenn.Code Ann. § 39–13–207(g) (1997 Repl.). A misapplication of an aggravating circumstance in a life without parole case is not a constitutional violation because there is no death sentence. *State v. Harris,* 989 S.W.2d 307, 317 (Tenn. 1999).

Under this statutory scheme, when a sentence is based upon one or more invalid aggravating circumstances, but at least one valid aggravating circumstance remains, reliance upon the invalid aggravating circumstance is not reversible error under either Tenn.R.Crim.P. 52(a) or Tenn.R.App.P. 36(b) unless the defendant demonstrates a gross abuse of discretion by the arbitrary imposition of the sentence. The misapplication must appear to have affected the result, involved a substantial right which more probably than not affected the judgment, or prejudiced the judicial process.

Tennessee Code Annotated § 37–1–134(a)(1) precludes a district attorney general from seeking the death penalty for crimes committed by a juvenile. There is, however, no legislative prohibition against a sentence of life without parole for a juvenile. In *State v. Antonio M. Byrd,* No. 02C01–9508–CR–00232, 1997 WL 1235 (Tenn.Crim.App., at Jackson, Dec. 30, 1996), *perm. to appeal denied* (Tenn., Sept. 22, 1997), this court so ruled. Moreover, this court also concluded that a sentence of life without the possibility of parole for a juvenile for a first degree murder conviction did not abridge the federal or state constitutional safeguards against cruel and unusual punishment. *See generally* U.S. Const.amend. VIII; Tenn. Const. art. I, § 16.

(3)

Protections against cruel and unusual punishment under the Eighth Amendment to the United States Constitution require an individualized sentence. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In a capital case, the sentences must be determined based upon "the circumstances of each· individual homicide and each individual defendant." *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court set aside the death penalty of an accomplice who did not fire the fatal shot, ruling that the "focus must be on [individual] culpability...." *Id.* at 797, 102 S.Ct. 3368. The court ruled that the constitution prohibits capital punishment when the defendant does not kill, attempt to kill, or intend that a killing take place or that lethal force be employed. *Id.* Later, however, in *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the high court relaxed the implications of the *Enmund* decision, ruling that "major participation in the felony committed, combined with reckless indifference to human life," was the test by which to determine whether two defendants, who were part of the crime of felony murder but did not personally cause the deaths of the victims, should be sentenced to death.

In that case, the two defendants helped their father and his cell mate escape from prison. They stopped a passing vehicle and abducted the occupants. While the two defendants left to get water, their father and his cell mate murdered each of the occupants. The majority in *Tison* ruled as follows:

> Similarly, we hold that the reckless disregard for human life explicit in know-

ingly engaging in criminal activities known to carry a grave risk of death represents a high culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

\* \* \*

Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.

481 U.S. at 157–158, 107 S.Ct. 1676; *see State v. Bigbee*, 885 S.W.2d 797, 817 (Tenn. 1994) (Reid, J., concurring) (citing *Tison v. Arizona*, 481 U.S. at 137, 107 S.Ct. 1676, 1676; *Enmund v. Florida*, 458 U.S. at 797, 102 S.Ct. 3368, 3377; *State v. Branam*, 855 S.W.2d 563, 570–571 (Tenn.1993); *State v. Middlebrooks*, 840 S.W.2d 317, 338 (Tenn. 1992)).

In *Gaile K. Owens v. State*, 13 S.W.3d 742 (Tenn.Crim.App., at Jackson, 1999), *app. filed*, (Tenn., Nov. 4, 1999), a panel of this court ruled that an aggravating circumstance "may be applied vicariously to a defendant [even] if he was not the actor responsible for the particular aggravating circumstance." at 761. Owens, who received the death penalty at her trial, had hired several men to kill her husband, had supplied them with helpful information, had kept their sons away from their father during the commission of the crime, and then had allowed them to discover the body. Death was the result of at least 21 blows to the head with a tire iron. Application of the "heinous, atrocious and cruel" aggravating circumstance was upheld even though the defendant was unaware of the method utilized to kill the victim. *See* Tenn.Code Ann. § 39–2–203(i)(5) (1982) (repealed 1989).

 Although these six cases at issue are not capital cases, the same aggravating circumstances necessary for the im-plementation of the death penalty must be considered in a sentence of life without the possibility of parole. *See State v. Stacy Dewayne Ramsey*, No. 01C01–9412–CC–00408, 1998 WL 255576 (Tenn.Crim.App., at Nashville, May 24, 1998), *perm. to appeal denied*, (Tenn., Jan. 25, 1999) (upholding the vicarious application of the avoiding arrest or prosecution aggravating circumstance to the defendant in a life without parole sentence because the defendant actively participated in the planning and nature of the killing). In determining whether any of the aggravating circumstances might be vicariously applied to the defendants (Cornett, Howell, Mullins, Sturgill, and perhaps even Risner) who did not actually fire the fatal shots, we consider, under *Tison v. Arizona*, whether their degree of participation in the felony was "major" and whether they displayed "reckless indifference to human life." If so, a particular aggravating circumstance may be applied. Whether a statutory aggravating circumstance might vicariously apply also depends upon the specific language of the state. *Erskine Leroy Johnson v. State*, No. 02C01–9707–CR–00292, 1999 WL 608861 (Tenn.Crim. App., at Jackson, Aug. 12, 1999), *app. filed*, (Tenn., Oct. 12, 1999, and Oct. 18, 1999). Some aggravating circumstances address the nature and circumstances of the crime. Others pertain to the particular conduct of a defendant in reference to the crime. *See generally*, Tenn.Code Ann. § 39–13–204(i)(1) through (14).

Because sentencing determinations require a personalized approach, this court must carefully review the evidence submitted by each of the defendants at the sentencing hearing.

### Karen Howell

Karen Howell was born on September 25, 1979. She has no prior record as a juvenile and has been incarcerated for these crimes since she was 17 years of age. She has never been employed. She dropped out of school at the age of 16 after

starting as a freshman at three different high schools.

Born in Delaware, Ohio, Howell and her family moved to Kentucky when she was three years old. She has one brother who is eight years her senior. Her parents divorced when she was nine. Howell explained that the marriage dissolved because her mother was a Christian and her father was not. Her early childhood was characterized by severe and violent fights between her parents.

Howell claimed that she had been sexually abused between the ages of five and ten by her paternal uncle and a cousin. She described herself as fearful of relationships. By the age of 13, she began the practice of self-mutilation. Howell reported that she had attempted suicide four times, twice by cutting her wrists and twice by overdosing on drugs.

Until the age of 14, Howell lived with her mother. The two fought often. Howell has a history of resistance to rules and regulations, inability to function in school, illegal drug usage, runaway behavior, and an interest in witchcraft, which began by her use of a Ouija Board and "automatic writing." Her mother found some of the automatic writings and provided them to ministers who attempted to "cast out demons." Howell claimed that she has created love spells to get two boys to date her. She believes that she hears voices.

After Howell's first semester of high school, she moved in with her father. She said that her father rarely communicated with her. Although Howell moved back into the home of her mother after only four or five months, she does not characterize her stay with her father in negative terms.

Howell had trouble in school because she simply could not perform the required work. She quit school and attempted to obtain her GED. She moved back to her father's residence and began to babysit for her brother and sister-in-law for as many as ten hours each day. Her sister-in-law helped her study for the GED.

By the age of 15, Howell was sexually active. She started experimenting with illegal drugs at age 15, using alcohol, marijuana, hashish, "shake," LSD, PCP, and cocaine. She had used LSD on 14 occasions, causing her to hallucinate. She spoke of two "bad trips": Once she tried to chew her friend's arm and the second time she sat alone on the floor of the bathroom for hours.

Howell became involved with Natasha Cornett and Joseph Risner in school. She and Cornett shared an interest in witchcraft and they both claim to hear voices. Howell, who says that she started hearing voices at age 13, also claims to have visual hallucinations of snakes, spirits, and demons. Howell and Risner were dating at the time of the shootings.

In January of 1998, Leonard Martin Miller, a clinical psychologist, conducted three interviews with Howell. In those meetings, Howell explained that she injures herself in order to get rid of emotional pain. She showed her scars to Dr. Miller and informed him that the last time she hurt herself was in April, 1997, just before the Lillelid shootings. Howell claimed that spirits pushed into her thoughts and caused her to strike out at herself. While conceding that she is "an emotional mess [and that] nothing could make [her] happy," she stated that she did not strike out at others.

Howell explained to Dr. Miller that she had severe mood swings which included episodes of extreme depression, uncontrollable crying, and suicidal urges. She stated that she also experienced manic phases, when she laughed uncontrollably. According to Howell, her mother had been diagnosed with a bipolar disorder and her behavior followed a similar pattern of depression and hyperactivity and rage. Howell's maternal grandmother and grandfather were also diagnosed with bipolar disorders.

Howell informed the psychologist that she experienced hallucinations and had participated in seances with Cornett. Howell claimed to be the medium in the seances and that spirits entered her body, causing her to become sad and depressed.

Psychological testing indicated that Howell functions within the borderline retarded range of intelligence. Her IQ is 78. According to Dr. Miller, who stated that she does not suffer from primary mental retardation, Howell has the potential to function within the average range of intelligence and has an ability to speak effectively, but does not function well under pressure, giving up easily. This conclusion was corroborated by her low grades and her statement that she never paid attention in school. The psychologist determined that Howell has a short attention span and possibly an attention deficit disorder. The psychologist's report indicated that "her judgment and reasoning abilities are quite poor, she thinks in a very simplistic concrete fashion and ... cannot cope with or fully comprehend complexities in a social or interpersonal situation." The psychologist found Howell to have a moderate alcohol problem and a marked drug addiction. He determined that she retreated into her idiosyncratic spiritual world as a defense mechanism in order to cope with her various problems. Dr. Miller's conclusions were that Howell suffers from bipolar disorder, depression with psychotic features, and post-traumatic stress disorder.

At the sentencing hearing, the trial court concluded that several mitigating circumstances were applicable to Howell. Specifically, it found that Howell had no significant record of prior criminal activity. Tenn.Code Ann. § 39–13–204(j)(1). While the trial court also found that Howell "was an accomplice in [a] murder committed by another person," Tenn.Code Ann. § 39–13–204(j)(5), it determined that this mitigating circumstance, which requires relatively minor participation in the crime, was not applicable because "no part in this horrible crime can be minor." The trial court found "in mitigation, that you were abused and neglected as a child. That you have a borderline retarded IQ of 78. That you subordinate yourself to the needs of others in a group, and that you have shown remorse." *See* Tenn.Code Ann. § 39–13–204(i)(9).

Ultimately, the trial court determined that facts favorable to Howell provided no relief to her sentence:

[The mitigating evidence is] overcome by and rebutted by the credible facts of the case, that for a long time before this occurred, you had been doing drugs and [participating in things of an] occult nature, and the occult mark continued on this case throughout the events that transpired. Its signature is throughout this case. You participated in everything in Kentucky. You helped steal guns and money. You helped initiate the plans for the trip with Ms. Cornett. You were at the picnic table at the rest area with the Lillelids when they were kidnapped, when they were crying. You were outside the van watching the Lillelids be murdered. You did nothing to stop, when a weapon was available. You deliberately and knowingly participated in every aspect of the killings and the things that led to them, including the getaway and cover up.

The trial court sentenced Howell to the maximum possible term and ordered that all of the sentences be served consecutively, based on a finding that Howell was a dangerous offender under Tenn.Code Ann. § 40–35–115.

### Natasha Cornett

Natasha Cornett was born January 26, 1979, in Betsy Layne, Kentucky. She withdrew from school before completing the ninth grade and, except for babysitting, has no history of employment. At the age of 14, she was arrested for the theft of a box of checks and for forgery. She was sentenced by the juvenile court to one year of probation. Cornett was ar-

rested a second time for assaulting her mother, Madonna Wallen, and threatening to kill her with a knife. Cornett's mother dismissed the charges. On the same day as the Lillelid murders, Cornett, who was by then 18 years of age, was charged in Kentucky with custodial interference with Karen Howell and Jason Bryant, both of whom were minors.

The record includes a significant amount of historical detail. Cornett's mother married Don Adkins in 1958. The marriage produced one daughter, Velina Adkins. The couple divorced in 1966. Four years later, Cornett's mother married Ed Wallen. Shortly thereafter, Cornett was born as a consequence of an extra-marital affair by her mother. At age five, she learned that Roger Burgess, a Pikeville, Kentucky, police officer, was her natural father. The Wallens divorced in 1982, at which time Velina Adkins, who was a victim of possible sexual abuse by her step-father, moved out of state.

Although Madonna Wallen did not remarry during Cornett's childhood, she had a number of relationships with other men. One of her boyfriends, Norman Bryant, made an attempt to be a father figure to Cornett. When Cornett was seven, however, Bryant left the relationship because he grew weary of Madonna Wallen's persistent infidelities and her violent outbursts.

In 1985, Madonna Wallen was successfully treated for breast cancer. During that time Cornett developed a close relationship with her maternal grandmother, Dovey Stratton. Stratton provided some stability in Cornett's life, but suffered a gall bladder attack the same year, "died on the table," and was "brought back to life." After she was revived, Stratton claimed that she could see things and could speak with dead people. Cornett was fascinated with her grandmother's discussions of the paranormal, an experience which contributed to Cornett's interest in the occult. Stratton died in 1987. In the same year, Cornett's mother had a nervous break-down and back surgery. After having an affair with a married attorney in Pikeville, Madonna Wallen filed suit for sexual harassment, but the case was dismissed. During this time, she was diagnosed as manic-depressive, was prescribed medication, and began psychiatric counseling. Wallen's behavior was even more erratic during this period of time. On occasion, she was abusive toward Cornett, who began to experience serious bouts with bulimia and depression. In the sixth grade, Cornett lost 30 pounds and was hospitalized for her eating disorder.

When Roger Burgess' wife died, Burgess began to show an interest in Cornett and began to accept her as his daughter. The relationship was described as "on again, off again."

Cornett made straight A's in elementary school. Until the seventh grade, Cornett had been a good student, polite, and conservative in her dress. By the sixth grade, however, she had begun the practice of self-mutilation. She cut herself more and more frequently as she grew older. While in middle school, she started to dress in dark clothing. She painted her fingernails black and wore dark eye and lip makeup. Her grades began to fall. At the age of 13, Cornett began to engage in sexual relationships.

Cornett and her mother fought frequently. In 1993, Cornett threatened to cut herself with a knife. When her mother tried to take the knife away from her, Cornett threatened her mother. Wallen called the police and Cornett was arrested. She was released by the police into the custody of her father. While living with her father, she attempted to commit suicide by slashing her wrists. At the age of 14, Cornett was hospitalized for 11 days for psychiatric care. She continued weekly outpatient therapy thereafter. Cornett was diagnosed with severe depression (manic-depressive and bi-polar) and was prescribed Prozac and Lithium. She continued outpatient treatment for four

months. At the age of 15, Cornett entered the Big Sandy (Kentucky) Impact program, a treatment program designed to help children through school and to cope with family issues. She dropped out because it "wasn't doing any good." By then, Cornett had started to use alcohol and illegal drugs. More specifically, she used heroin, ecstasy, cocaine, and acid. Cornett was arrested for stealing and passing bad checks. She wrote the checks and a boyfriend passed them at a video store. She was given probation in June, 1994. She dropped out of school at age 16.

Cornett married Steve Cornett on her seventeenth birthday. While she denied that her wedding was "Satanic," the couples dressed in "Gothic" clothing and the maids of honor were "chained together." The marriage lasted ten months. Cornett suffered from depression as a consequence of the divorce and afterward moved to New Orleans where she panhandled with a girlfriend and lived on the streets. Cornett claimed that she was raped while there. At that point, Wallen moved her back into her home. Their relationship, however, continued to deteriorate. Nonetheless, Wallen permitted Cornett's friends to visit her residence for days at a time. There was no supervision.

At the sentencing hearing, Cornett denied that she worshiped Satan, but confessed a belief in his existence. She acknowledged that she attempted to contact spirits and demons through various rituals. She professed a belief in God and rejected the notion of animal and human sacrifices.

Psychiatrist Robert Sadoff, who interviewed Cornett on three occasions for a total of eight hours, reported that she had been hearing voices since the age of two. She claimed that anti-psychotic medications did not help. He stated that she claimed to see some of the "spirits" or "demons" who speak to her. She told Dr. Sadoff that the spirits sometimes predicted her future and, at other times, directed her to kill herself so that she could join them. Dr. Sadoff reported that Cornett believed she was hassled in school for being a "freak." Smoking cigarettes by the age of five, Cornett claimed that she was regularly high on marijuana after she quit school. She also acknowledged prior use of crystal methane, PCP, and other illegal drugs. She remarked that she had used LSD well over 100 times. Dr. Sadoff recalled that Cornett believed she had lived prior lives and had out-of-body experiences. She believed that her soul may have become pregnant at some point in her life. Cornett claimed to have been sexually abused at the age of two, but she could not recall the identity of the abuser.

Dr. Sadoff reported that Cornett cut herself several times and, on other occasions, had overdosed on sleeping pills, Lithium, and vodka. She was never hospitalized for an overdose. She also described periods of time where she would go without sleep. She reported that while in New Orleans, she slept in abandoned homes. She claimed to have been gang-raped and beaten by five men. During the rape, she reported that she "tried not to be there."

Cornett told Dr. Sadoff that she could communicate with Karen Howell during her out-of-body experiences. She described Howell as her "soul mate" and stated that the two cut themselves the night before the Lillelid murders and drank each other's blood. She reported that since the crimes, she and Howell have shared violent and disturbing dreams.

Dr. Sadoff reported that Cornett cried when discussing the murders. She claimed to be especially upset because she was unable to save the children. She said that she would have left the group after the killings if she had known that her other friends would not have been hurt.

Dr. Sadoff concluded that Cornett was not psychotic nor out of touch with reality, but that she is "clearly, mentally and emotionally disturbed, and has been for a number of years." He stated that she has symptoms of bipolar disorder and mixed

personality disorder and also has symptoms of dissociative disorder and antisocial traits. In his view, however, she was not legally insane during the commission of the crimes.

At the conclusion of the hearing, the trial court ruled as follows in administering the maximum sentence possible:

> Not only do the statutory aggravating circumstances outweigh those, but those mitigating circumstances are, in fact, rebutted by the facts of this case: [a] history of some violent behavior, the fact that you had killing on your mind when you left Kentucky. Not necessarily a ring leader, but the evidence shows that you were the instigator and orchestrator of the trip and the things that led to the death of the Lillelids.... You took an active part in the kidnaping of the Lillelids at the rest area ... You suggested that the guns be obtained.

### Jason Blake Bryant

The defendant, Jason Bryant, was born on July 18, 1982, in Helier, Kentucky. Fourteen years old at the time of the Lillelid murders, he was 15 years old at the time of the sentencing hearing.

Bryant has an IQ of 85 and, according to tests, the emotional and social skills of an eleven-year-old. He was in the eighth grade at the time of the Lillelid murders. The last school he attended was Millard High School located in Pike County, Kentucky. He was taking educational courses while awaiting trial in the Greene County Detention Center.

Bryant has a history of alcohol and drug abuse. The presentence report indicates that he began to use alcohol as early as three years of age. He reported that he has used marijuana and "other drugs" since the age of nine. At the time of his arrest, Bryant was in a mental health treatment program at Mountain Comprehensive/Creekside in Pikeville, Kentucky.

Bryant's prior record consists of two 1996 offenses, both of which were handled by the (juvenile) Court of Justice of the Commonwealth of Kentucky. The first charge was that he was beyond the school's control, for which he was ordered to enter a day treatment program after enrollment in Millard High School. He was also found to be a habitual runaway as the result of a joyride to Indiana in his sister's automobile. Bryant was ordered intensive home supervision and was placed in counseling. During his period of supervision, he passed drug screens for a period of two months until the murders of the Lillelid family.

Bryant first met Natasha Cornett in early March of 1997. She picked him up on a street corner in Pikeville, Kentucky, and took him to her home. While there, Cornett, eighteen years of age at the time, supplied him with vodka and bourbon. Bryant and Cornett kissed during this first meeting and Bryant spent the night at Cornett's home. Apparently, Cornett did not learn Bryant was only fourteen years old until the following morning. Bryant claimed that he did not see Cornett again until April of 1997, just before the murders. At their second meeting, Bryant met Joseph Risner, Dean Mullins, and Crystal Sturgill for the first time. Bryant had met Karen Howell a year earlier.

At the conclusion of the sentencing hearing, the trial court made the following observations:

> I find that you were aggressively urging others on to do things at that time, that you personally carried one of the guns. That, in fact, you were a shooter. I don't know who all were the shooters. I think there was more than one. I have seen no real remorse or emotion displayed by you. I find the evidence shows that you were aggressive in the killings, that you helped use a gun to kidnap the Lillelids in the first place.... You had gunshot residue all over you. You were in the van for two days with Lillelid property all around you and under your feet, including a baby seat and baby's toys. You bragged

about the crimes in jail in Arizona. You have a history of drug abuse and a callous attitude.

### Edward Dean Mullins

Dean Mullins was born on January 26, 1978, in Harold, Kentucky. Mullins, who was 19 years old at the time of the shootings, was 20 years old at the time of the sentencing hearing. He chose not to testify at the hearing.

The last school Mullins attended was Betsy Layne High School in Betsy Layne, Kentucky. He quit school in 1996 during his twelfth grade year. At the time of his arrest for the murders of the Lillelid family, he was in the process of obtaining his GED.

Although Mullins has no history of alcohol abuse, he acknowledged prior use of marijuana. He has no prior criminal record either as a juvenile or as an adult. Mullins was employed at a grocery store in Pikeville, Kentucky, in 1993 and 1994. He was unemployed at the time of his arrest.

Mullins dated LaShonda Bailey for about one year and two months, breaking off the relationship in March of 1997 due to his emotional attachment to Natasha Cornett. Mullins resided with his parents until moving in with Cornett. His family and friends expressed immediate concern about his interest in Cornett and observed negative changes in his behavior. Mullins had attended church regularly until he became involved with Cornett. His parents unsuccessfully attempted to convince him to return to their residence. Mullins and Cornett had planned to be married.

Mullins chose not to testify at the sentencing hearing. At the conclusion of the proceedings, the trial court ruled as follows:

> You had positive gunshot residue on your sweater. You participated in all of the events in Kentucky. . . . You left the rest area with the Lillelids, in Mr. Risner's automobile. You didn't have to do that. It was a deliberate and knowing act, following the van. And there's really no proof of it, but the proof is that Delfina and Tabitha were crying at the picnic table, before they got in the van, and it seems to me that conversations with them about that, that it's logical to assume, beyond a reasonable doubt, that you had to know something was wrong. . . . You participated in the getaway and cover up. You were in the van for two days with Lillelid property, a baby seat under your feet, children's toys. You had many chances to get away, to do something about what was going on, to report that a child had been murdered and a baby left for dead. You did nothing. You were a participant in it by your actions and your non-actions, and I find, therefore that the sentences should be, in each of the three counts of first degree murder, life without the possibility of parole.

### Joseph Lance Risner

Joseph Risner was born October 13, 1976, in Hazard, Kentucky. He had no record as a juvenile. As an adult, his only charge was in Pike County, Kentucky, for custodial interference with Karen Howell and Jason Bryant on the same day as the Lillelid murders.

Risner never met his biological father. His mother, Mary Louise Stamper Johns, was married briefly to Risner's father, Christopher Johns, but the two divorced before he was born. His mother has been married twice since. Risner has had good relationships with both of his step-fathers.

Risner was only two years old when his mother married Ray Risner. Although never adopted by his first stepfather, Risner chose to use his surname. He calls Ray Risner "Dad." The family lived in Columbia, Kentucky, where Risner started school. His academic record from kindergarten to the third grade was good. He played little league baseball and liked dogs.

In August of 1986, the family moved to Georgia where Risner started the fourth grade. Ray Risner started a construction business there. During the summers, Risner did odd jobs around the construction sites and Ray payed him $3.50 per hour. Ray Risner says that Risner developed a good work ethic.

Risner's step-father began to use marijuana, alcohol, and cocaine and his mother also used marijuana and cocaine. In early 1988, they separated when Ray Risner had an affair with one of his wife's closest friends. The separation upset Risner. One year later, the couple reconciled, but they separated when Risner was twelve. Risner's grades slipped dramatically and he failed the seventh grade.

At the age of 14, Risner returned to Kentucky with his mother where they lived with Mary Risner's sister, Josephine. Risner became actively involved in the Pentecostal Church. When Mary and Ray Risner finally divorced in 1991, Ray Risner was not required to pay child support. Risner and his mother had no further contact with Ray Risner until after the Lillelid murders.

Risner has a history of marijuana, alcohol, and LSD usage. At the sentencing hearing, he testified that he first used marijuana at the age of ten and that he first tried LSD at age eleven. At age twelve, he had sexual relationships with two of his babysitters.

While in middle school, Risner's academic record was poor. He made mostly F's during his eighth grade year and was to repeat the eighth grade. Transcripts, however, indicate that he enrolled in the ninth grade the following fall. By this time, he wore long hair and an earring. He felt rejected by his stepfather.

In 1992, Risner's mother began taking classes at a community college. She married Larry Castle in October 1993. Risner had a good relationship with Castle, whom he called "Papa." The family regularly smoked marijuana together. In the tenth grade, Risner's grades began to improve. The family moved in the winter of 1993 to Sizerock, Kentucky. Risner finished the tenth grade at his new school.

In the summer of 1994, the family moved to Ivel, Kentucky. At the age of 18, Risner started the eleventh grade in Ivel at Betsy Layne High School, where he met Natasha Cornett, Karen Howell, Dean Mullins, and Crystal Sturgill. Risner began to date Natasha Cornett. Risner's mother disliked Cornett because she found her to be disrespectful. Risner and Cornett dated only a short time but maintained a friendship. Risner began to date Karen Howell for the first time in early 1995. He was eighteen and she was fifteen at the time.

On April 25, 1995, Larry Castle was involved in a car accident which resulted in the death of the driver of the other car and serious injury to a passenger. Castle pled guilty to charges of reckless homicide and second degree assault.

In June of 1995, Risner joined the Army but received an administrative discharge after testing positive for marijuana. During the late summer of 1995, Risner moved back to Leslie County, Kentucky to complete the twelfth grade. In the first semester, he generally made good grades. He withdrew from school in March of 1996, citing "family problems" surrounding his stepfather's convictions.

The following year, Risner moved in with a friend and tried to re-enroll at Betsy Layne High School, but was denied because he was nineteen years old. He earned a GED on May 29, 1996. Risner returned to his family in June of 1996. The following month, Castle was sentenced to five years in prison, an event which devastated Risner and his mother. They visited Castle at the prison nearly everyday.

Risner was accepted at Mayo Regional Technology Center in September of 1996. He received Pell grants to cover the cost. He made A's, B's, and C's in the first two

terms and made new friends. He continued to visit his friends from Betsy Layne High School every weekend that fall.

In January 1997, Risner began his third term at Mayo. Two months later, he renewed his relationship with Karen Howell, who was then living with Natasha Cornett. Cornett was dating Dean Mullins. Risner claimed that he fell deeply in love with Howell.

At the sentencing hearing, Dr. Margaret Robbins, a psychiatrist, testified that the crimes did not "fit" with Risner's previous life history. She also indicated her belief that he would pose no behavioral problems while incarcerated. She concluded that Risner was extremely remorseful for the crime. Her diagnosis of Risner was that he has a borderline personality disorder and polysubstance abuse. Dr. Robbins indicated that borderline personality disorder, typically associated with childhood trauma and/or neglect by primary caretakers, has the core characteristic of instability. According to Dr. Robbins, borderline personality types resort to "self-defeating and ineffective ways of coping—or they simply fall apart and decompensate under the weight of unmanageable emotions."

At the conclusion of the sentencing hearing, the trial court ruled as follows:

> It was your car, driven by you, that made the trip. You held a gun on the Lillelids at the picnic table. You got the ball rolling in the kidnaping. You rode in the van with the Lillelids begging and crying and singing and with a gun in your hand and Peter in the baby seat. You deliberately ran over the Lillelids.... You drove the getaway van. You were a leader. Not the leader, but a leader.... [Y]ou had the presence of mind to take the tag from your car, your papers and clothes at the scene.

### Crystal Rena Sturgill

Crystal Sturgill, who was born on March 13, 1979, in Harold, Kentucky, was 18 years old at the time of the shootings.

She was 19 at the time of the sentencing hearing. At the time of her arrest, Sturgill was in her senior year at Betsy Layne High School in Betsy Layne, Kentucky. She also attended Floyd County Technical School in Drift, Kentucky, at the time. School records indicate that Sturgill was a slightly better than average student. Her performance through the eighth grade was very good, but her grades began to decline once she entered high school. Sturgill missed more and more classes and eventually lost interest in her studies. She explained that the decline in performance was due to her use of drugs and alcohol. Sturgill performed well on standardized tests, including a total score of 28 on her ACT, and had applied for admission to several colleges. She had planned to attend Murray State after graduating from high school and hoped to major in child psychology.

During her junior and senior years of high school, she enrolled in the co-op program, working at the Betsy Layne Elementary School daycare. Her supervisors believed Sturgill was capable at child care. She consistently received marks of "excellent" in twenty categories of her evaluations. All other categories were marked "good."

Sturgill has no prior criminal history as either a juvenile or an adult. While in the ninth grade, she did receive an in-school suspension for smoking in a locker room. In the tenth grade, she was suspended from school for three days for fighting on a school bus with a girl she thought to be picking on her younger brother, Estill.

Sturgill did not complete the portion of the presentence report questionnaire regarding non-prescribed or illegal drug use. She did, however, acknowledge use of both alcohol and illegal drugs.

Sturgill was born out of wedlock. Her mother, Teen Blackburn, refused to divulge the name of her father. His name does not appear on her birth certificate. The only information available about her natural father is that he is a high school

graduate who works for the highway department. He was at one time married but is now divorced. Sturgill was three years old when her mother married her stepfather, Gene Blackburn. Teen and Gene Blackburn have two children, Nicole, age 15, and Estill, age 14.

During her interview with Diana McCoy, a psychologist, Teen Blackburn classified the relationship between Sturgill and her stepfather as "really good." Other family members and friends reported that her stepfather treated her differently than his own two children. Apparently, he was more strict with Sturgill, often punished her without cause, and required more household chores from her than the other children. Other observers commented on the amount of emotional neglect Sturgill suffered in her home. According to several teachers and friends, Sturgill's mother and stepfather did not help with her college applications. While her mother was aware that Sturgill wanted to major in child psychology, she did not know where her daughter had applied for college. Her teachers assisted Sturgill in the application process. There were also reports that her parents did not provide funds for school trips and that her friends often had to help. Sturgill was involved in the Future Homemakers of America organization. She had hoped to marry her ex-boyfriend, Patrick Charles, as a means of leaving home.

In December of 1996, Sturgill accused her stepfather of sexually abusing her. She claimed the abuse began when she was four years old and had escalated to digital penetration by the time she began school. Sturgill claimed that her stepfather began sexual intercourse when she was thirteen but stopped when she began to date Patrick Charles. Charles confirmed that Sturgill had confided in him on the matter. Several friends and teachers had suspected Sturgill had been abused by her stepfather. Sturgill told a friend, Crystal Turner, about the abuse two weeks before informing her teacher,

Beth Jones. Her teacher contacted the guidance counselor, Vicki Ratliff. Both remarked that Sturgill was obviously relieved when she informed them of the improprieties.

Blackburn admitted to having abused Sturgill and pled guilty to the charges brought against him. The accusations however, created a conflict within her family. Her mother refused to believe Blackburn had sexually abused Sturgill even after he acknowledged the abuse. Other family members also refused to believe the accusations, causing further division within the household.

After reporting the abuse, Sturgill was placed in the foster home of Ricky and Judy Gobel of Bainesville, Kentucky. She remained there for only a few days before going to live with her aunt, Joanne Marsillett, in Prestonburg, Kentucky. Sturgill had stopped attending school when she made the allegations in December of 1996 and did not return until January of 1997, when she began at Prestonburg High School. Sturgill's mother did not contact her or otherwise provide her with support. At Christmas, Sturgill was not allowed to see or speak to her younger brother and sister and they were not allowed to keep her gifts.

In mid-February of 1997, Ms. Marsillett told Sturgill that she had to leave because she was expecting her son to return from Arizona. Sturgill moved in with her grandmother, Gladys Sturgill, for about two weeks when her two uncles, Kennelly and John Sturgill, got drunk and accused her of lying about the sexual abuse accusations. Sturgill left her grandmother's house that night, walking to a neighbor's house. At this point in time, she began to stay with friends for short periods of time until she was told to leave. Sturgill lived in approximately thirteen different places from the time she made the allegations in December until the shootings occurred in April. In early April, Sturgill, who did not know Cornett very well and reportedly did not have a good relationship with her,

moved into her house. Cornett's mother, Madonna Wallen, was known for allowing friends and acquaintances of Cornett to stay at their home. Reportedly, Sturgill called Cornett only as a last resort after she had been turned down by everyone else.

Sturgill and Dean Mullins had been close friends for several years before Mullins began to date Cornett. Sturgill was aware that Mullins' parents had unsuccessfully attempted to persuade him to return to their residence. Sturgill was concerned that Cornett would be a negative influence on Mullins and attempted to protect him.

Sturgill chose not to testify at the sentencing hearing. At the conclusion of the proceedings, the trial court found as follows:

> There are some mitigating . circumstances in your case, and perhaps more than for some other defendants. I find that you had no significant history of prior criminal activity.... [Y]ou were an accomplice in a murder committed by another person and ... your participation was relatively minor. I agree with everybody that no participation in these events can be described as minor.

The trial court, which observed that Sturgill had a childhood marked by abuse and neglect, clinical depression, and borderline disorder, also ruled as follows:

> The mitigating circumstances are rebutted. There was a lot of talk in Kentucky about death and killing, before you set out from Kentucky.... You were present when everything was happening in Kentucky, ... the rituals, the burglarizing, the stealing, getting the guns, preparing. You knowingly went in the car following the van from the rest area to that place. Tabitha and Delfina were crying even before they left the picnic table. Just like I told Mr. Mullins, you may not have pulled the trigger. You may have been horrified by this, but everything that you did showed that you adopted this and gave it your name. You were certainly a willing participant

in the getaway and the cover up. You had many chances to get away, many chances to report to [the authorities]. [Y]ou left a baby for dead at the scene of the crime.

## Adjudication

### (1)

■ Karen Howell, aside from pointing to "a huge difference in participation and culpability" and asserting that "all defendants received exactly the same sentence," is unable to articulate why a separate sentencing hearing was warranted. In truth, Howell's complaint is an attack upon the length of the sentence and the lack of parole possibilities rather than any procedural flaw in the joint sentencing hearing. In our view, the trial court did not abuse its discretionary powers by denying a separate hearing. The record demonstrates that Howell had the opportunity to present evidence to distinguish her conduct from that of the other defendants so as to assure an individualized sentence. Moreover, the testimony of those defendants who, like Howell, were cross-examined by other defense counsel, provided additional facts and circumstances in proper context. The backgrounds of each defendant and their relative culpability in the crimes afforded the opportunity for a thoughtful evaluation of the relevant sentencing considerations.

This court must also consider the propriety of Howell's sentence. One of two juveniles involved in the offenses, Howell has low intelligence and was abused and neglected as a child. While labeled a follower and remorseful for her participation in the crimes, she was adjudged by the trial court to have helped set the stage for the crimes. Her extensive experimentation with illegal drugs, her obvious interest in the occult, and her involvement in the planning of the fateful trip laid the essential groundwork for the brutal attack upon the four members of the Lillelid family. She had particularly strong relationships

with Risner and Cornett, who were leaders in the commission of the crimes. According to the trial judge, Howell "helped use a gun to kidnap the Lillelids in the first place." She had gunshot residue "all over." A self-described "emotional mess" who experiences "severe mood swings," Howell is hardly a likely candidate for a productive life. Despite her youth, her lack of stable, familial support, her bipolar disorder, her lack of education and work history, and her unusual life experiences suggest little hope for successful treatment or rehabilitation.

While the issue will be more specifically addressed in later portions of this opinion, at least one of the statutory aggravating circumstances as found by the trial court, applies as to each of the three murders. Howell's guilty pleas and the recorded facts document that conclusion. Howell helped plan the trip. She assisted in the acquisition of the guns and helped with the financing. She had a connection with a weapon utilized in the abduction. She was involved in the conversation at the picnic table when the decision to kidnap was made, the event which led to the deaths of the victims. She was in the stolen van with the Lillelid family as they were transported to the murder scene. Of the six defendants, her interest in the occult was matched only by Cornett. She saw the murders. Like the others, she fled in the vehicle stolen from the victims and shared in the effort to avoid detection by leaving the state and surreptitiously crossing the Mexican border.

▄▄▄ In our view, the trial court did not abuse its discretion by determining that Howell merited a life sentence without the possibility of parole on grounds that all three of the murders were to avoid arrest and prosecution. Tenn.Code Ann. § 39–13–204(i)(6). That aggravating circumstance applies to the murders and not the specific conduct of a particular defendant. Her participation in the events leading to the death of the victims was sufficiently "major" and her mental state was one of

"extreme recklessness" as to the consequences of her acts. She merely watched as Tabitha Lillelid was terrorized by the events, and was an occupant of the van when Risner drove over the critically injured and dying Delfina Lillelid. *See* Tenn.Code Ann. § 39–13–204(i)(5). This aggravating circumstance related to the murder, not the conduct of a specific defendant. Because the statute requires that "the defendant" commit mass murder to support that aggravating circumstance and there was no proof that Howell fired any shots, the trial court erred in that assessment. Tenn.Code Ann. § 39–13–204(12). By use of the *Harris* standard, however, the misapplication of that circumstance to each of the three murders would have been harmless. The trial court, as sentencer, must only weigh and consider the aggravating and mitigating circumstances. For a life without parole sentence, an aggravator need only be present. The aggravating circumstances need not outweigh the mitigating circumstances in order to support a life without the possibility of parole sentence. *State v. Harris,* 989 S.W.2d at 309, 314–317. Because at least one aggravating circumstance was present as to each of the three murders, the life without parole sentences were not arbitrary. Under these circumstances, the misapplication does not appear to have affected the result or prejudiced the judicial process.

▄▄▄ As a participant in a series of crimes involving plan and a design which continued over a significant period of time, Howell also qualifies as a dangerous offender. In our view, Howell did not hesitate to participate when the risk to human life was particularly high. As an occupant of the Lillelid van, she witnessed firsthand the victims' fears, their faith, their pleas for mercy, and their eventual destruction. All of this warranted a severe sentence. An extended sentence is necessary to protect the public. The willingness to participate in killings in order to avoid detection of a robbery indicates an inordinate risk to

society. The imposition of consecutive life sentences without the possibility of parole is not erroneous even when Howell served more in a supporting rather than a leading role in much of the criminal activity. Despite the opportunity to do so, Howell did nothing to disassociate herself from the course of criminal conduct and by her direct participation in the abduction, she explicitly endorsed the plan. The evidence does not preponderate against the trial court's conclusion that consecutive sentencing for all four crimes was proper. Accordingly, the judgment of the trial court is affirmed as to Howell.

(2)

Natasha Cornett also complains that the failure to sever the sentences precluded individual consideration. She asserts that the trial court improperly applied aggravating circumstances, failed to adequately weigh mitigating circumstances, and erroneously classified her as a dangerous offender for consecutive sentencing purposes. She specifically asserts that the holding in *State v. James Gordon,* No. 01C01–9611–CC–00495, 1998 WL 44920 (Tenn.Crim.App., at Nashville, Feb. 5, 1998), *perm. to appeal denied* (Tenn., Dec. 14, 1998), concurring in results only, precludes consecutive sentences. Cornett, like the other defendants, asks for a sentence of life with the possibility of parole.

As in the case of Howell, the rationale for the severance argument is based more upon the dissatisfaction with the length of the sentence than any procedural flaw in the joint sentencing hearing. Cornett contends that her relatively minor role in the crimes and her considerable remorse warrant a lesser sentence than some of the more culpable defendants.

As previously indicated, our view is that there was no error in holding a joint sentencing hearing. Thus, the essential issue is the propriety of the overall sentence. Initially, Cornett had a history of abuse and neglect as a child. There were other mitigating circumstances: Mental and emotional disturbance, possible bipolar disorder and symptoms of a dissociative disorder, and remorse for her crimes. While at one time a good student, Cornett had a well-developed sense of anti-social behavior by the age of 14. She experimented extensively with illegal drugs, developed a strong interest in "spirits" and "demons," and engaged in other criminal activities. The trial court characterized Cornett as "the instigator and the orchestrator of the trip ... that led to the deaths of the Lillelids." Furthermore, she suggested that "guns be obtained." She had a particularly influential relationship with Howell, Risner, Mullins, and Bryant. While relatively young, Cornett had life experiences well beyond her years and in many respects played the leadership role in the various crimes. There was some evidence that Cornett wanted to emulate the young murderers in the motion picture "Natural Born Killers" and was more than willing to abduct the children of Vidar and Delfina Lillelid. Her letters to Howell after the arrests included sets of triangles, similar to the shapes left by the bullet wounds to the adult Lillelids' chests.

Aggravating circumstances clearly apply to each of the three murders. While Cornett claims that she argued with other defendants in an effort to save the lives of the victims, other evidence suggests a less sympathetic role. Cornett, the evidence suggests, may have been the most influential of the six defendants. Her residence was utilized as a meeting place. She played a leadership role in the plan to leave Kentucky. Vidar Lillelid approached Cornett and Howell first at the rest stop. Risner and Bryant joined the conversations later. Cornett was present when Risner announced their intentions to abduct the entire family. Cornett heard the Lillelids' pleas for mercy. She handled one of the murder weapons just before it was used to commit the three crimes. Cornett witnessed the murders and fled from the state, and eventually the country, with the other five defendants.

At least one of the three aggravating circumstances applied in each case. While Cornett did not personally kill any of the three victims, her participation in the events was "major" and her interest, in our view, extremely reckless. That each of the three murders was committed to avoid arrest and prosecution was an aggravating circumstance properly applied to Cornett. Tenn.Code Ann. § 39–13–204(i)(6). Cornett was over 18 years of age and one of the victims, Tabitha Lillelid, was less than 12. Tenn.Code Ann. § 39–14–204(i)(1). Cornett was in the van when it was driven over the dying body of Delfina Lillelid and took no action to shield Tabitha Lillelid from witnessing the murder of her parents. Tenn.Code Ann. § 39–14–204(i)(5). Thus, the heinous, atrocious, and cruel circumstance would apply to two of the murders. Misapplication of the mass murder aggravating circumstance, which specifically applies to the personal conduct of "the defendant" by the terms of the statute, would qualify as harmless error under the *Harris* standard as to each of the murders. Under these circumstances, sentences for life without the possibility of parole were entirely appropriate for each of the three murders and not, in our view, arbitrarily imposed.

By application of the *Wilkerson* standards, it is our view that the evidence does not preponderate against Cornett's classification as a dangerous offender. Because our supreme court concurred in the results only of our opinion in *State v. Gordon*, that case lacks precedential value. In fact, our supreme court has upheld consecutive death penalties where two or more first degree murders were at issue, and has also upheld terms of years when ordered consecutive to a death sentence. *See, e.g., State v. Smith*, 868 S.W.2d 561 (Tenn. 1993). When sentences beyond the death penalty are not a "nullity," it can hardly be argued that these are. In short, Cornett can properly be described as an offender who, without hesitation, participated in crimes where the risk to human life was high. No matter how lengthy, the terms imposed could hardly be described as too severe in relation to these crimes. Finally, a lengthy sentence for Cornett, under all of her circumstances, would serve to protect the public. Accordingly, the judgment is affirmed.

### (3)

Jason Bryant claims a misapplication of the aggravating and mitigating circumstances and argues that the trial court erred by the imposition of life sentences without the possibility of parole. He submits that he does not qualify as a dangerous offender and asserts that consecutive sentences were not warranted.

Only 14 years and nine months old at the time of these offenses, Bryant already had a lengthy history of drug and alcohol abuse. He had a juvenile record in Kentucky due to unruly behavior in school and the unlawful taking of his sister's automobile. Bryant became associated with the other defendants through his chance meeting with Cornett, who picked him up on a street corner a few weeks before the murders and took him to her home. Bryant, who described Cornett as involved in a "Satanic thing," informed a friend that there was "some kind of a Manson reunion."

The greater weight of the evidence was that Bryant, despite his youth, was a leader in the murders of the Lillelid family. There was proof that Bryant was instrumental in the decision to steal a car and that he treated the victims callously as they were driven to the murder scene. Bryant was armed and, according to the other defendants, actually shot each of the victims. While Bryant blamed Risner for the murders, the trial court found Bryant "to be a shooter" and observed that he demonstrated no remorse or emotion. There was evidence that Bryant bragged about his participation in the crimes, ordered Howell not to talk, and described the killings as "a rush" which "gives you power."

Clearly, statutory aggravating circumstances were present in each murder. Bryant personally committed mass murder. Tenn.Code Ann. § 39–13–204(i)(12). That factor was properly applied to each of the crimes. There was sufficient evidence to establish that he and the others committed each of the three murders to avoid arrest and prosecution. Tenn.Code Ann. § 39–13–204(i)(6). The murders of Delfina Lillelid and Tabitha Lillelid were "especially heinous, atrocious, or cruel" for the reasons outlined by the trial court. Tenn. Code Ann. § 39–13–204(i)(5). Bryant does not submit any serious challenge to the application of aggravating circumstances. Other than his age, there are few mitigating circumstances which would apply. In our view, the trial court did not abuse its discretion or otherwise act in an arbitrary manner by imposing life sentences without the possibility of parole in each case.

Moreover, the *Wilkerson* factors would permit his classification as a dangerous offender. He did not hesitate to commit crimes involving risk to human life. Because the crimes are so egregious, the length of the aggregate sentence could hardly be characterized as disproportionate. Society must be protected from individuals who, like Bryant, engage directly in such outrageous conduct. It is our conclusion that the evidence does not preponderate against the findings of the trial court that Bryant warranted consecutive sentences. Accordingly, his sentences for each of the four crimes are affirmed.

(4)

Dean Mullins complains that the trial court abused its discretion by denying his request for a separate sentencing hearing. He argues that the trial court misapplied aggravating circumstances and failed to properly balance them against mitigating circumstances. Mullins generally argues that the trial court failed to follow the statutory sentencing guidelines and asserts that consecutive sentences are inappropriate due to the ruling in *State v. Gordon.*

Although the point is obviously moot because the plea agreement precluded the imposition of the death penalty, Mullins also complains that the state violated a post-arrest agreement to dispense with any request for capital punishment (conditioned upon the proof showing that he was not a shooter) by initially asking for the ultimate penalty. In consequence of the agreement, Mullins provided information to the state which apparently helped lead to the discovery of the murder weapons. Of course, a knowing and voluntary guilty plea to first degree murder without the possibility of the death penalty resolves any questions about a possible breach of an immunity agreement. The state, while perhaps not timely in its efforts, eventually honored the promise. Therefore, that issue will not otherwise be addressed.

The trial court found that Mullins had no prior criminal record and that his participation in the crimes was minor, at least in comparison to most of the other defendants. Another mitigating circumstance was that Mullins had drawn a diagram to assist officers in locating the murder weapons although, in the words of the trial judge, "those guns should have been found anyway." The trial court also concluded that, through his other witnesses, Mullins had demonstrated prior good character and remorse for his participation in the crimes. The trial court expressed concern, however, about his drawings of "characters," found in his possession, which "became more evil and more violent in their nature" as time progressed. That indicated an interest in the occult. The trial court determined that Mullins tested positive for gunshot residue and "participated in all of the events in Kentucky just before the trip was made, the burglaries, the theft, the shoplifting, and occult ceremonies." The trial court described Mullins' participation in the murder as indirect. He, as driver, and Sturgill followed in Risner's vehicle while the other defendants accompanied the Lillelid family in their van. The trial court rejected Mullins'

claim that he had acted under the domination of Cornett. Bryant testified that Mullins had participated in the shooting of the victims, a claim that the other defendants refuted. There was also evidence that Mullins searched the victims' pockets and was unsympathetic when they cried for mercy.

While Mullins acquired a weapon and funds for the trip from Kentucky, the trial court made no finding as to whether Mullins was one of the gunmen. He did have shotgun residue on his clothing despite the fact that he drove to the murder scene in a separate vehicle. There was sufficient evidence, in our view, that Mullins' participation in the crimes qualified as "major" and that his mental state qualified as extremely reckless. He adopted the plan to steal the Lillelids' van and, by operating Risner's vehicle, chose to follow the van to the scene of the murders. There was proof that he actually confronted the victims, ordered them to cease their cries for mercy, and searched their pockets at the crime scene. Mullins participated in the two-day effort to avoid arrest and prosecution, fully aware of the seriousness of the three crimes. Tenn.Code Ann. § 39–13–204(6). So, at least one aggravating circumstance would apply to each murder. Mullins was over 18 and Tabitha Lillelid was less than 12. Tenn.Code Ann. § 39–13–204(1). That aggravator would apply to her murder. The murders of Delfina and Tabitha Lillelid were especially heinous, atrocious, and cruel. Tenn.Code Ann. § 39–13–204(i)(5). Mullins' participation was substantial enough to warrant the application of that circumstance to those two murders.

Depending on the murder victim, one or more aggravating circumstances apply to each murder. Medical evidence indicated Vidar Lillelid was killed first as Delfina Lillelid and their two children watched. Delfina Lillelid, while mortally wounded by several gunshots, was still alive when struck by the van. Tabitha, who cried throughout much of the ordeal, watched as her parents were brutally murdered before her own execution. The infliction of severe physical and mental pain upon a conscious victim may qualify as torture. *State v. Williams*, 690 S.W.2d 517 (Tenn.1985). The three shots to the chest of Delfina Lillelid in the shape of a triangle were beyond that necessary to produce death. Expert testimony established that two separate weapons were utilized. Delfina Lillelid may have been alive when her daughter's body was placed over hers in the shape of a cross. Furthermore, our supreme court has ruled that "anticipation of physical harm to oneself is tortuous." *State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999) (citing *State v. Nesbit*, 978 S.W.2d 872, 886–87 (Tenn.1998)). In *Carter*, our high court further observed that "mental torment is intensified when a victim either watches or hears a spouse, parent, or child being harmed or killed, or anticipates the harm or killing of a close relative and is helpless to assist." *State v. Carter*, 988 S.W.2d at 150.

The misapplication of the "mass murder" aggravating circumstance to Mullins because he might not have personally shot any of the victims would qualify, in our view, as harmless error under the *Harris* standard. Tenn.Code Ann. § 39–13–204(12). While perhaps less culpable than Bryant, Risner, or Cornett, Mullins' level of participation warranted life sentences without the possibility of parole on each of the murders. There was no abuse of discretion by the trial court in the imposition of those sentences.

The *State v. Wilkerson* factors also apply. That is, the evidence supports Mullins' classification as a dangerous offender. The circumstances establish little hesitation to commit the crimes and no regard for human life. Mullins helped the other defendants arm themselves in Kentucky. He provided funds for the trek and was involved in the decision to steal a car when it became apparent that Risner's vehicle was inadequate. The path chosen led to the abduction of an entire family and the

murders of a husband and wife and their six-year-old daughter and permanent life-threatening injuries to their two-year-old son. Mullins played a role, major or minor, depending upon the credibility of the various other defendants, in the process. Bryant testified that Mullins participated in the shootings. The terms, regardless of their length, reasonably relate when the crimes are as egregious as these. The triangular pattern of shots to the chests of two of the victims suggest a form of perverse ritualism, a direction Mullins adopted as he developed his relationship with Cornett. By entering pleas of guilt, Mullins accepted responsibility for the murders.

The evidence established that Mullins played a significant role in the crimes. He acquired a weapon and he operated the Risner vehicle after the abduction. Society merits an extended period of protection. Accordingly, the sentences in all four crimes as to Mullins are affirmed.

(5)

Joseph Risner challenges the application of the aggravating circumstances. He argues mitigating circumstances were entitled to greater weight and complains that the imposition of consecutive sentences was erroneous.

The trial court concluded that there were mitigating circumstances: "A childhood of abuse, neglect, and abandonment"; "psychological problems"; "a personality disorder"; and "remorse" for his crimes. Another positive aspect is that he achieved his general equivalency diploma after leaving school a few months before graduation. In the fall of 1996, he enrolled in a technological school and successfully completed two terms. Yet, Risner also began to use illegal drugs at an early age and was discharged by the Army after testing positive for marijuana. His initial association was with Cornett, but by the time of these crimes, he described himself as "deeply in love" with Howell.

It was Risner who first confronted the Lillelids with a weapon and who ordered them into their van. He held a weapon as the Lillelids were directed to the scene of the murders. There was evidence Risner participated in the shootings and drove the van over the bodies of the victims (and that Delfina Lillelid was still alive when he did so) as the defendants left the scene. There was evidence that on the night before the shootings, he remarked in a telephone call that "we are going to be wanted for murder tomorrow." There was evidence Risner spoke of having had to commit the murders in order to avoid detection. The trial court concluded that Risner was a leader in the commission of the offenses. He took the license tags and the contents of his own vehicle before leaving it at the scene.

While difficult to reconcile the conflicting claims and the physical evidence in ascertaining who was primarily responsible for the Lillelid murders, certainly Risner was a major participant and he exhibited "extreme recklessness" with regard to the lives of Vidar, Delfina, and Tabitha Lillelid. Again, aggravating circumstances clearly apply to each murder. Risner may have had direct participation in each of the three murders. Tenn.Code Ann. § 39–13–204(i)(12). So, mass murder may have been applicable. Even if not, however, a misapplication of that aggravator would have qualified as harmless error under *Harris.* Risner initiated the abduction and held the weapon on the Lillelids, directing them to the scene of the murder. He attempted to cover up the crime, he took control of the van after the shootings, and he drove over the bodies of the victims as the defendants fled from the scene. Tenn.Code Ann. § 39–13–204(i)(6). So, the murders were committed to avoid arrest and prosecution. Delfina Lillelid was most likely still alive when struck by the vehicle. Tenn.Code Ann. § 39–13–204(i)(5). Risner was over 18 years of age. Tenn.Code Ann. § 39–13–204(i)(1). He was present as Tabitha watched the murders of her parents. Tenn.Code Ann.

§ 39–13–204(i)(6). In our view, at least one aggravator would apply to each murder. As indicated, any misapplication of the mass murder aggravating circumstance would have been harmless under the *Harris* standard. In our assessment, the facts warranted three sentences of life without the possibility of parole. The trial court did not abuse its discretion by concluding that Risner warranted sentences of life without the possibility of parole. Those determinations were not arbitrarily applied.

Furthermore, Risner qualifies as a dangerous offender. He helped plan the robbery and led in its commission as well as in the commission of the kidnapings which ultimately led to the three murders. Even though the risk to human life was high, there was no hesitation on the part of Risner in initiating the confrontation. The offenses are so severe that the terms, no matter how long, cannot be described as unreasonable in relation. Society must be protected from defendants who pose such a threat. Thus, the evidence does not preponderate against the imposition of consecutive sentences. Accordingly, Risner's sentence is affirmed. ·

### (6)

Crystal Sturgill complains that the trial court should have granted her a separate hearing from the other defendants due to the "markedly different degrees of culpability which were glossed over in a mass sentencing." She contends that the trial court failed to appropriately balance the mitigating circumstances against the aggravating circumstances and argues that without a showing of "vicarious liability for the aggravating circumstances, all of which apply to the killings, [she] cannot be held liable for any more than the strict liability already imposed upon her by the felony murder rule." Sturgill also argues that consecutive sentences of life without the possibility of parole are "a nullity" based upon the ruling in *State v. Gordon,* and that the evidence does not support her

classification as a dangerous offender for consecutive sentencing purposes.

The trial court concluded that there were mitigating circumstances in that Sturgill had no significant history of prior criminal activity and that her participation was relatively minor in murders committed by other individuals. The trial court observed that Sturgill had suffered a childhood of abuse and neglect and had been diagnosed as clinically depressed. The trial court concluded, however, that the mitigating circumstances had been rebutted because, while in Kentucky, Sturgill had been present when there were general discussions about death and killing. A psychological report indicated that Sturgill overheard Cornett's expressed "desire to kill somebody and start Armageddon." The trial court observed that Sturgill was aware of the rituals, thefts, and the weapons of the defendants as they prepared for their trip yet decided to accompany them anyway. The trial court determined that Sturgill was "a willing participant in the getaway and the coverup" despite the opportunity to report the matter to authorities. The trial court acknowledged that Sturgill had been truthful in her dealings with authorities and observed that she had been the first among the defendants to cooperate in the investigation. The state insisted that her cooperation should be given little, if any, weight as a mitigating circumstance due to the delay in providing information.

There is no evidence that Sturgill had any involvement in seances, the casting of spells, self-mutilation, or the occult. Those activities were of particular interest to Cornett and Howell. Other than Sturgill's decision to join the other defendants on their trip, there is little indication that she had a strong relationship with them. Cornett had been involved in a relationship with Risner sometime earlier, was dating Mullins at the time of the murders, and had a brief romantic encounter with Bryant. At the time of the murders, Risner was "deeply" involved with Howell.

Howell and Cornett were "soul mates." While Sturgill had a boyfriend, he was not a part of this group.

Sturgill had been removed from her home because of possible sexual abuse by her stepfather and required to live in a foster home for a short time before she moved in with an aunt. After a short period with her aunt, Sturgill had to move to the residence of her grandmother, who lived near her stepfather. There were conflicts within the family due to her allegations of sexual abuse and Sturgill again had to move. Sturgill stayed with friends at various locations, never returned to her high school, and, because she reached the age of 18 in mid-March of 1997, was required to become self-supporting. By all appearances, she moved in with Cornett's mother, Madonna Wallen, as a last resort. Howell stole a weapon in preparation for the trip, Mullins acquired a weapon from a friend's residence, Risner provided the vehicle, and Cornett, because she was familiar with New Orleans, chose the destination, Sturgill had nothing other than her presence to offer in the way of assistance.

The record indicates that Sturgill had less contact than the others with the Lillelid family at the rest stop. While the other defendants were passengers in the Lillelids' van, Mullins followed in Risner's vehicle. Sturgill was his only passenger. No testimony indicates that Sturgill participated in the murders. Apparently, she remained in Risner's vehicle throughout. The evidence suggests that she wept during the ordeal. While not blameless for the events, Sturgill was clearly the least culpable of all defendants. Faced with little choice, Sturgill chose to participate in the trip, was aware of the plan to steal the van, and ultimately acknowledged her responsibility for the murders of Vidar, Delfina, and Tabitha Lillelid.

As in the other cases, Sturgill's complaint about the trial court's failure to grant a severance is less a challenge to the procedure than an attack upon the effective sentence, three consecutive terms of life without the possibility of parole plus twenty-five years, and the fact that her sentence was the same as that imposed on the other defendants. It is our view that the trial court properly denied the request for severance. Although there were six defendants and varying degrees of involvement, a joint hearing permitted the trial court to assess each individual in context of the entire circumstances of the crime.

By her pleas, Sturgill acknowledged her involvement in the murders. She was guilty of three felony murders in the perpetration of a kidnaping. While there were mitigating circumstances, particularly her demonstrated work ethic and an unusually high score on a standardized test for college admission, there were aggravating circumstances attendant to each of the murders for which Sturgill must accept responsibility. Initially, the crimes qualified as mass murder but Sturgill did not personally commit any of the three murders. Tenn.Code Ann. § 39–13–204(12). That aggravating circumstance was misapplied. Because Tabitha Lillelid was less than 12 years of age and Sturgill had just reached the age of 18, the murder of Tabitha Lillelid involved an aggravating circumstance. Tenn.Code Ann. § 39–13–204(i)(1). There was evidence to support the conclusion that the murders of Delfina and Tabitha Lillelid were especially heinous, atrocious, and cruel in accordance with the terms of the statute. Tenn.Code Ann. § 39–13–204(i)(5). There is little question that the murders were for the purpose of avoiding detection, arrest, and prosecution for the theft of the van. Tenn. Code Ann. § 39–13–204(i)(6). Our scope of review is limited on this issue. Because there was a waiver of the right to a jury in the sentencing proceeding, the trial court became the fact finder and was entitled to weigh the aggravating circumstances on a discretionary basis. So long as the evidence does not indicate any gross abuse of discretion on the part of the trial judge and there are aggravators present, the sentences must stand as imposed even if

one aggravating circumstance has been erroneously applied.

As indicated by the trial judge, Sturgill's level of participation was relatively minor. In consequence, each of the aggravating circumstances as to her likely qualified as vicarious. As determined by the trial court, Sturgill had to be aware of the travel plans, the ritualistic activities, the acquisition of the guns, the theft of the Lillelids' van, the murders, and the flight to avoid arrest and prosecution. From all of this, the trial court concluded that Sturgill warranted the same sentences of life without the possibility of parole as the others because she made no effort to escape or notify authorities. We agree with that assessment. Because, however, the application of the aggravating circumstances was vicarious, attributable to Sturgill only due to the conduct of the others, a significant question is whether her "participation in the felony murder[s] is major and the likelihood of killing [under the surrounding circumstances] so substantial as to raise an inference of extreme recklessness." *Tison v. Arizona,* 481 U.S. at 154, 107 S.Ct. 1676. In *Enmund v. Florida,* the United States Supreme Court held that a defendant who waited outside as the driver of the getaway vehicle could be convicted of felony murder when his two codefendants, who were sentenced to death, robbed and killed an elderly couple at their home. The high court ruled, however, that Enmund could not be put to death without proof that he intended to facilitate the murders even though he helped plan the robbery.

Because our statutory scheme requires similar determinations for both a life without the possibility of parole sentence and the death penalty, both *Enmund* and *Tison,* are instructive on the issue. In *State v. Stacy Dewayne Ramsey,* slip op. at 42, a panel of this court ruled that "active participation," coupled with an aggravating circumstance, was enough to subject the defendant to a life without parole sentence when codefendants actually committed the murder.

No participation in crimes of this magnitude may be considered minor but that does not necessarily imply that Sturgill's level of participation was "major" and her intent reckless in the extreme. Sturgill was a follower. For reasons known only to her, she accepted the plan to leave Kentucky. She consented to the decision of the more active participants to abduct the Lillelids, knowing full well of the collective need for better transportation. She was not forced into the Risner vehicle and there was another option available, to merely stay behind, when the others elected to steal the van. Sturgill, while apparently aggrieved at the criminal acts of her companions, made another choice at the scene. Instead of disassociating herself from the murders, she accepted transportation in the van, fully aware it had been stolen from the murdered or critically injured victims, and thereby endorsing the heinous criminal acts of the others. She was in the van when the bodies were driven over by Risner. Delfina Lillelid was still alive. For two days, Sturgill participated in the flight to avoid authorities. She willingly traveled out of this state and then out of the country. By participating in these events, she "adopted" the crimes as her own, quietly contributing in a "major" way and, while perhaps more sympathetic to the plight of the victims than her companions, extremely reckless insofar as the circumstances she silently endorsed so tragically endangered every member of a vulnerable, innocent family. Thus, the murders were committed to avoid arrest and prosecution. Tenn.Code Ann. § 39–13–204(i)(6). That aggravator could be properly applied to Sturgill. As to the Tabitha Lillelid murder, Sturgill was 18 and the victim less than 12. Tenn.Code Ann. § 39–13–204(i)(1). Her level of participation was sufficient, in our view, to warrant the heinous, atrocious, and cruel circumstance aggravator in the murders of Tabitha and Delfina Lillelid. Tenn.Code Ann. § 39–13–104(i)(5). Even the with

misapplication of Tenn.Code Ann. § 39–13–204(i)(12), because Sturgill did not personally shoot and murder "three or more" persons, the trial court did not abuse its discretion by imposing three sentences of life without the possibility of parole. Any misapplication of the "mass murder" circumstance was harmless under the *Harris* standard. Because at least one aggravating circumstance was present as to each murder, the life without parole sentence cannot be classified as arbitrary.

While of little consolation to Sturgill, the entirety of the evidence, partially due to the wide disparity of involvement in the preparation, planning, and execution of the trip, the theft, the abduction, and the murders, does preponderate against the imposition of consecutive sentences. There are seven statutory grounds for the imposition of a consecutive sentence. Only one, wherein the defendant might qualify as "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high" is arguably applicable. The dangerous offender classification, as has been previously observed, is subjective in nature. The circumstances of the crime, as they relate to the defendant "and not merely on the fact that two or more dangerous crimes were committed" control the determination. *Gray v. State*, 538 S.W.2d at 393. In *Wilkerson*, "lack of hesitation" was described by our supreme court as a reckless indifference or "conscious lack of concern for foreseeable consequences." *State v. Wilkerson*, 905 S.W.2d at 937. In our view, Sturgill's acquiescence in the abduction of the Lillelid family qualified as reckless, particularly in view of her knowledge of the propensities of the other defendants. The deaths of the victims, under these particular circumstances, may have been reasonably foreseeable. Thus, the first *Wilkerson* factor favors the state's argument for a consecutive sentence. Yet our sentencing scheme requires an assessment of each individual involved in the crimes, even where there are multiple defendants. It is unlikely, in our view, that a sentence beyond life without the possibility of parole for Sturgill is necessary to protect the public. Our law provides her with no chance of release. While the severity of these offenses would warrant an aggregate sentence of almost any length, the imposition of concurrent sentences without parole in Sturgill's case should, on one hand, reflect the seriousness of the crimes and, on the other hand, differentiate the level of her participation in the course of events versus those of the other defendants. That she had no home and no family support placed her in a precarious situation. The proof suggests that Sturgill might not have been with the other defendants if other alternatives had been available. Her sentences are modified to concurrent sentences, but parole is not a possibility.

## Conclusion

Emboldened perhaps by their own numbers, their weapons, and the power to force their wills upon a defenseless young family whose own beliefs they may have found repugnant, the defendants present the worst kind of fears to a society dependent upon conformity with the law. Collectively, the defendants placed little value on the sanctity of human life. The sentences of each defendant, with the exception of Sturgill, are affirmed. Sturgill's sentences are modified to three concurrent life sentences without the possibility of parole for the three first degree murder convictions and one concurrent sentence of 25 years for attempted first degree murder.

WELLES and HAYES, JJ., concur.