# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 23, 2002 Session

## STATE OF TENNESSEE v. SCOTT M. CRAIG

**Direct Appeal from the Criminal Court for Bradley County**
**No. 98-231     R. Steven Bebb, Judge**

**No. E2001-01528-CCA-R3-CD**
**August 27, 2002**

Defendant, Scott Craig, was convicted by a Bradley County jury of one count of aggravated kidnapping and two counts of aggravated rape. He was sentenced to eight years for aggravated kidnapping and fifteen years each for the aggravated rape convictions. The trial court ordered the two aggravated rape convictions to be served concurrently with each other, but consecutively to the aggravated kidnapping conviction, for an effective sentence of twenty-three years. Defendant appeals his conviction and sentence, presenting the following issues for review: (1) whether the trial court made improper and prejudicial comments during the trial which deprived Defendant of his right to a fair trial; and (2) whether the trial court erred by imposing consecutive sentences. After a thorough review of applicable law and all relevant facts and circumstances in the record, we affirm Defendant's convictions. We reverse the judgment of the trial court concerning the length of Defendant's sentence for aggravated rape and the trial court's order of consecutive sentencing, and remand this matter for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed in Part and Reversed in Part.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JERRY L. SMITH, J., joined.

Leonard "Mike" Caputo, Chattanooga, Tennessee (on appeal) and Ashley L. Ownby, Cleveland, Tennessee (at trial) for the appellant, Scott M. Craig.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Jerry N. Estes, District Attorney General; Stephen D. Crump, Assistant District Attorney General; Carl F. Petty, Assistant District Attorney General; and Shari Lynn Tayloe, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**FACTS**

On July 8, 1997, nineteen-year-old Angela Taylor arrived at work at Jack's Kleen-Rite in Cleveland at approximately 6:50 a.m. The dry cleaner business was scheduled to open at 7:00 a.m. Ms. Taylor was working alone that morning. Within minutes of opening, a male customer walked into the establishment carrying a blue-jean jacket. Per company policy, Ms. Taylor wrote the customer's name, phone number, and the date he wanted his dry cleaning returned on a laundry ticket. He then stated that he had to return to the car to empty the jacket's pockets. As he exited the store, she entered his name and phone number into the computer. The customer's car, a 1982 Camaro, was parked directly in front of the business. She watched as he took the jacket to the car and placed it where she could not see his exact movements. He then returned with the jacket and said, "Now, do me a favor." When she inquired as to the favor, he grabbed her by the wrist and warned, "Now, go to my car and don't scream, don't try to get away." She noted that prior to this, he never flirted or made any "off-handed" comments.

Defendant then led her by the wrist out of the store and into his car. She testified that Defendant had a strong grip on her wrists and she knew that she could not get away. He ordered her to climb in through the driver's side door onto the passenger's seat and she complied. He then climbed into the driver's seat, leaned over and locked her door, and drove away. As they drove, she noticed that Defendant was carrying a knife on his belt. Ms. Taylor begged to be released and returned to the store. Defendant stated to her that he would take her back "when you give me a blow job." When Ms. Taylor refused to unzip his pants, Defendant unzipped them, grabbed the back of her head, and shoved her head down towards the front of his pants. He held her head down and forced her to perform fellatio. He then warned her, "If your head comes up you are dead." Although she continued to beg him to not make her do this, he warned her not to "piss him off." She stated that his tone of voice was very firm and demanding. She testified that she performed the act because she was fearful that Defendant would make good on his threats.

Eventually, Defendant stopped the car on a deserted gravel road. He then stated, "[t]hat's not working," referring to the oral sex, and reached for her shorts. She informed him that she was on her menstrual cycle and was wearing a tampon. Defendant ordered her to remove her shorts, her underwear, and the tampon. Once removed, he threw the tampon out the window. Although she begged him not to force her to have sex, he merely replied, "Don't make me mad." She stated that she was afraid to physically resist for fear that he would hurt or even kill her. Defendant then grabbed one of her arms and pulled her on top of him and penetrated her vaginally. After a short while, he stated, "Well, that's not working either," and forced her to lie down on the driver's side seat. He climbed on top of her and penetrated her again, stopping when he ejaculated.

Defendant then drove to another location, an empty field, and stopped the car. He forced Ms. Taylor to exit the car and begin walking. Defendant explained to Ms. Taylor that his family had controlled him his entire life, and that he had raped her because he wanted to be in control for once. Ms. Taylor testified that she did not attempt to run because she was in an unfamiliar area and she was afraid that he would find her and kill her. While they were standing in the field, he pulled out

his knife, placed it to her throat and stated, "I know you are going to tell, so I'm going to kill you." She pleaded for her life and explained that she had a six-month-old daughter at home. After hearing this, Defendant lowered the knife, grabbed her hand, and led her back to the car and drove off. While driving, Defendant apologized for his actions and explained that he just wanted to have control of his life.

As they were driving, Ms. Taylor began to recognize the surrounding area and realized that they were returning to Cleveland, Tennessee. Although she pleaded to be released, Defendant insisted on returning her to her place of employment. However, as they neared the dry cleaners, they saw her boss's van and a police car parked outside. Defendant then said, "I'm f---ed" and drove away. Ms. Taylor promised Defendant that she would not tell anyone what had happened. Defendant instructed her to tell her boss that she just went for a walk. After traveling a few blocks, he stopped the car, unlocked her door, and instructed her to slam the door when she exited. She complied. Ms. Taylor then asked a woman in a nearby car to drive her back to the dry cleaners so that Defendant could not return and pick her up. When they arrived in front of the dry cleaners, she ran inside and told her boss, Jackie Scoggins, and Officer Hanshaw what had transpired.

Ms. Taylor identified Defendant in court as her assailant. She also identified the knife confiscated from Defendant's possession by police as the weapon Defendant had brandished. On cross-examination, Ms. Taylor admitted that at the preliminary hearing, she stated that when Defendant ordered her to leave with him, his tone of voice was "[n]ot really hateful or anything, just kind of calm." She also admitted that in her statement to police on July 8, 1997, she said when they first entered the vehicle, Defendant told her, "I'm not going to kill you or anything."

Jackie Scoggins, a co-owner of Jack's Kleen-Rite, testified that Ms. Taylor had been a faithful employee for approximately six years. She testified that on July 8, 1997, she stopped at the dry cleaners at approximately 7:30 a.m., while running an errand. When she entered the premises, she found two customers waiting at the cash register. However, after searching the store, she was unable to locate Ms. Taylor. She recalled speaking to Ms. Taylor when she called the store that morning at 7:00 a.m. She became alarmed when she found Ms. Taylor's make-up, glasses, keys, drink, and breakfast on the counter beside the cash register. Ms. Taylor's purse was also sitting behind the partition. Everything else in the store was intact, including the clothes and the money in the cash register. After assisting the customers, she called the police.

Ms. Scoggins also noticed that Defendant's name and a description of an article of clothing to be cleaned was entered into the computer. However, there was no garment matching that description in the laundry basket. She testified that per company policy, an employee must first complete a laundry and cleaners' tag for each customer, which includes the customer's name, phone number, and the item to be cleaned. Then, the employee must enter the customer's information into the computer. She further stated that she did not find a laundry ticket for Defendant. Shortly after police arrived, a lady drove up in a blue car and Ms. Taylor ran into the store. She testified that Ms. Taylor was crying and upset and visibly shaken. While she hugged Ms. Taylor and attempted to calm her down, Ms. Taylor kept saying, "he raped me, he raped me . . . [h]im, him. It's on the

computer." She testified that prior to July 8, 1997, Ms. Taylor was a reliable and dependable employee, and that she had never left the store unattended.

Officer David Hanshaw testified that on July 8, 1997, he was dispatched to Jack's Kleen-Rite at approximately 8:13 a.m. to investigate a "missing persons" call. When he arrived at 8:19 a.m., he met Jackie Scoggins. Ms. Scoggins explained that the front desk clerk, Angela Taylor, was missing. She further informed him that Ms. Taylor's personal items remained in the store. Within five to fifteen minutes of his arrival, a woman ran through the door screaming, crying, and very hysterical. He later identified this woman as Ms. Taylor. After calming her down, she told him that she was raped by a male customer and related the events of that morning. Ms. Taylor then informed him that she had entered her assailant's name and phone number into the computer. He retrieved this information from the computer. The time of the entry was 7:01 a.m. Ms. Taylor also gave a description of Defendant's automobile. On cross-examination, Officer Hanshaw admitted that after examining the crime scene, he saw no evidence of a struggle.

Detective John Dailey, Jr. of the Cleveland Police Department testified that he was the lead investigator in this case. He arrived at Jack's Kleen-Rite at approximately 8:25 a.m. to respond to a possible missing persons report. Upon arrival, he learned that Ms. Taylor, the alleged missing person, had returned. He recalled that when he first encountered Ms. Taylor, her hair was disheveled and it appeared that she had been crying. She also appeared very scared and upset. He stated that Ms. Taylor related the events of that morning as told to Officer Hanshaw. He retrieved Defendant's name and phone number from the computer. From this information, officers were able to obtain Defendant's home address. Later that day, Defendant was arrested at his place of employment, Easterly Cabinets. During the arrest, officers confiscated a knife that was strapped to Defendant's right hip. Defendant admitted that he had the knife on him when he stopped at the dry cleaners that morning and that he carried the knife most of the time. Defendant further claimed that he used the knife at work.

Detective Dailey interviewed Defendant. He testified that Defendant claimed that he had taken a jacket to Jack's Kleen-Rite earlier that day. Defendant stated that he flirted with the front desk clerk, made some "lines and comments" and convinced her to leave with him. He claimed that he and Ms. Taylor engaged in consensual sex. Defendant stated that he first met Ms. Taylor on that morning.

On cross examination, Detective Dailey admitted that he took a statement from both Ms. Taylor and Defendant. He further admitted that both statements were fairly consistent with the exception of whether or not there was consent. He testified that he did not see any physical evidence of bruising on Ms. Taylor. He also admitted that in Ms. Taylor's statement, she never mentioned that Defendant pulled a knife on her and forced her out of the store. Instead, she stated that Defendant grabbed her by the hand and ordered her to follow him out of the store. However, Detective Dailey testified that in his opinion, Ms. Taylor had been forcefully removed from the store because the store was left open, and Ms. Taylor's personal belongings were in plain view.

Doctor John Denman testified that he performed a rape examination on Ms. Taylor on July 8, 1997, at approximately 9:00 a.m. When he first encountered Ms. Taylor, she appeared scared and distraught and was crying, weeping, and obviously disturbed. At the time of the examination, Ms. Taylor was on her menstrual cycle and there was a small amount of menstrual bleeding. However, her cervix was closed. He testified that there were no signs of any external bruising, or any signs of bruising or lacerations in the perineal area. He also examined her throat and found no evidence of bruising or redness. He retrieved tissue samples to prepare semen cultures and performed a pelvic examination to ensure that there were no abnormalities. He further stated that while it is usual in rape cases to see evidence of trauma in the vaginal area, it is not always present. When asked, he further testified that in his opinion, approximately forty percent of rape victims that he has examined have some type of bruising, redness, or markings after the attack. However, he stated that this depends on the method used to commit the act. He further testified that as an ER physician, he has witnessed some patients that feign sexual assault, and that they normally appear very detached, unemotional, and very matter of fact about how things happened. However, these persons were usually not as emotionally distressed as Ms. Taylor.

Defendant testified in his own behalf. He denied kidnapping or raping Ms. Taylor. While Defendant's testimony somewhat coincided with Ms. Taylor's account of the morning's events, he claimed that he and Ms. Taylor willingly left her employment and that they engaged in consensual sex. He denied threatening Ms. Taylor with bodily harm. He testified that while he had a knife on his person that day, it never left its sheath. He further testified that he only uses the knife to perform his job duties at Easterly Cabinets. Defendant then admitted that before he was arrested, officers informed him that he was being charged with kidnapping and rape. Then, they asked if he knew what it was about and he replied, "the only thing that he could think of was the girl that morning."

The State called Lieutenant Danny Chastain as a rebuttal witness. He testified that he served the arrest warrant on Defendant at his place of employment, Easterly Cabinets. He stated that when he placed Defendant under arrest, Defendant did not respond. When asked if Defendant knew what the arrest was about, he stated, "The girl from this morning." He further testified that he never stated the charges against Defendant at the time of the arrest.

## ANALYSIS

### I. Trial Court's Comments

Defendant argues that the trial court made improper and highly prejudicial comments during the testimony of various witnesses, in the presence of the jury, which effectively deprived him of his right to a fair trial. Specifically, he contends that the trial court erred by commenting on the evidence, by emphasizing and drawing attention to certain witnesses' testimony, and by making remarks that were demeaning to defense counsel. He claims that he was unduly prejudiced by the trial court's various comments and interjections and that these acts, taken together, constitute "plain error." We disagree.

In support of this argument, Defendant claims first that the trial court made improper comments concerning the evidence during the State's direct examination of Officer David Hanshaw. The colloquy between the witness, prosecutor, defense counsel, and the trial court transpired as follows:

[Prosecutor]: Okay. Tell the jury who was there and what happened when Ms. Taylor came back in?

[Hanshaw]: Okay. Myself, Jackie, and I believe Sergeant Gates was there when she come running in, just run right through the door screaming and crying and then she went right to the back office.

[Prosecutor]: Well, did she say anything?

[Hanshaw]: She really didn't say anything to me right there. She was just crying, very hysterical.

[Prosecutor]: Do you remember her saying anything to anybody when she first came in?

[Hanshaw]: The way she was acting it was hard to gather. We had to try to calm her down to get some information from her.

[Prosecutor]: Officer, in your opinion how would you characterize the victim's demeanor at this time, or state of mind?

[Hanshaw]: Very, very, not normal. She –

[Prosecutor]: Was she upset, was she hysterical –

[Hanshaw]: Upset, traumatic, –

[Defense Counsel]: I believe he's leading the witness, your Honor.

Court: He is, but he said to begin with she was hysterical when she came in, and crying, and I think that's a pretty good description.

Defendant also claims that, during the prosecutor's direct examination of the victim, Ms. Taylor, the trial court further erred by interjecting statements that were unnecessary and unduly emphasized her testimony to the jury, and cites the following excerpt from the record:

| [Prosecutor]: | All right. So why didn't you try to run off or get away from him at this point? |
|---|---|
| [Taylor]: | I didn't know where I was, you know, which way to run, and I was afraid he would find me and then he would kill me. |
| [Prosecutor]: | Excuse me, I didn't hear you on the last. |
| Court: | She said that she thought if she ran that he would find her and kill her. |

In addition, Defendant contends that the trial court made an improper objection during defense counsel's cross-examination of Officer David Hanshaw:

| [Defense Counsel]: | And I don't see anything written [i]n your [notes] that show any type of trauma or any type of bruising or anything of that in any nature, and so I'm assuming from what you've testified to you saw no evidence of any bruises on her. Is that a fair statement? |
|---|---|
| [Hanshaw]: | I didn't examine her physically. |

*　　*　　*

| [Defense Counsel]: | Officer, she was wearing shorts that morning. Correct? |
|---|---|
| [Hanshaw]: | I really can't remember exactly what she was wearing. |
| [Defense Counsel]: | All right. But there was nothing about her face, her arms and/or her legs that would let you know – |
| Court: | Asked and answered. You said, "did you see any bruises?" He said, "no." |
| [Defense Counsel]: | Does the court have any other questions? |
| Court: | Do you have any other questions? |

Defendant contends that the following dialogue, which took place during defense counsel's cross-examination of Ms. Taylor, constitutes additional evidence of the trial court's negative attitude toward defense counsel:

[Defense Counsel]:     Ms. Taylor, my name is Ashley Ownby. I want to ask you some questions, go over a couple of things. I don't want to hit you broadside on anything, I don't want to trick you but I want to go over some of the things you've told Officer Dailey over here. Do you remember the statement you gave him, and I'm assuming prior to coming to trial you've reviewed this statement, haven't you?

[Taylor]:     I can't hear you.

Court:     Yes, I can't hear you either. You are mumbling.

[Defense Counsel]:     Well, I'm sorry, Judge, I guess I'm the one we need to worry about.

Court:     I think so.

Finally, Defendant argues that the trial court interjected the following commentaries and objections during defense counsel's cross-examination of Ms. Taylor, which were inappropriate and where no objection was made by the State:

[Defense Counsel]:     Now, was there anything that prompted him to take his knife out of his sheath at that time, ma'am?

Court:     That would be asking her for something in his head, wouldn't it?

                    *          *          *

[Defense Counsel]:     Ms. Taylor, would it be a fair statement that you made no physical effort to get away from--

Court:     I believe that has been asked and answered twice, once by him and once by you.

[Defense Counsel]:     I know Detective Dailey said it, but I don't believe she has said--

Court:     All right. Ma'am, did you make any physical effort to get away?

-8-

| [Taylor]: | No. I was afraid he was going to kill me. |
|---|---|
| Court: | Thank you. |

Defendant contends that the above statements, made by the trial court in the presence of the jury, were antagonistic, disparaging, and improper. Defendant asserts that, while the cited language does not embody all of the court's inappropriate comments, they demonstrate the court's negative attitude toward defense counsel and the adverse atmosphere in which Defendant's case was tried.

First, we note that in each of these instances, defense counsel failed to raise an objection during trial. Failure to object or take whatever action is reasonably available to prevent or nullify the harmful effect or error constitutes waiver of the issue on appeal. See Tenn. R. App. P. 36(a). However, this Court may, in its discretion, consider an issue which has been waived upon a finding of "plain error." Under the "plain error" doctrine, "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). To determine whether "plain error" exists, the following factors should be considered by an appellate court:

a) the record must clearly establish what occurred in the trial court;
b) a clear and unequivocal rule of law must have been breached;
c) a substantial right of the accused must have been adversely affected;
d) the accused did not waive the issue for tactical reasons; and
e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

This test was formally adopted by our supreme court in State v. Smith, 24 S.W.3d 274 (Tenn. 2000). In Smith, the court emphasized that all five factors must be established before plain error may be recognized, and further stated that complete consideration of all the factors is unnecessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283. Additionally, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations omitted). Our review of this case reveals no plain error, that is, no error which has affected the substantial rights of Defendant. See Tenn. R. Crim. P. 52(b); Adkisson, 899 S.W.2d at 641.

Turning to the trial judge's comments, we are mindful that judges in Tennessee are prohibited by our state constitution from commenting upon the evidence during trial. See Tenn. Const. art. VI, § 9. "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 406-07 (Tenn. 1989). In other words, a trial judge should be very careful not to express any thought that would lead the jury to infer that

-9-

his or her opinion was in favor of or against the defendant. See State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992); Suttles, 767 S.W.2d at 406-07.

In the first three circumstances cited by Defendant above, the trial court's comments were essentially only a reiteration of the witness's testimony. As for the other statements cited by Defendant in his brief, we agree that the trial court might have used more circumspect language in addressing defense counsel. However, given the relative strength of the State's case, we do not find that the court's comments affected the verdict or resulted in prejudice to the judicial process. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Our review of the entire record further reveals no evidence of impropriety in any of the trial court's other remarks during trial. Accordingly, we find the trial court's comments, overall, affected no "substantial rights of the accused." Tenn. R. Crim. P. 52(b). Neither did the alleged error rise to a level such that consideration of it is "necessary to do substantial justice." Adkisson, 899 S.W.2d at 642. Defendant is not entitled to relief on this issue.

## II. Consecutive Sentencing

Defendant also challenges the trial court's imposition of consecutive sentencing. He argues that the trial court erred by imposing consecutive sentences based upon its finding that he was a "dangerous offender," because he does not meet the criteria for such classification. Defendant further asserts that the trial court's classification of him as a dangerous offender, where no enhancement factors were found applicable to his case, is inconsistent, and his sentences should therefore be served concurrently.

The imposition of consecutive sentences is controlled, in part, by Tennessee Code Annotated section 40-35-115. This section provides that the trial court may consider consecutive sentencing if a defendant is charged with more than one criminal offense. Tenn. Code Ann. § 40-35-115(a) (1997). In addition, the trial court must find, by a preponderance of the evidence, that a defendant satisfied one of seven criteria, including "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-114(b)(4); see State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

"The dangerous offender classification, as has been previously observed, is subjective in nature." State v. Howell, 34 S.W.3d 484, 515 (Tenn. Crim. App. 2000). In State v. Lane, 3 S.W.3d 456 (Tenn. 1999), the supreme court stated that before consecutive sentencing is imposed based on dangerous offender status, the Sentencing Act requires that "there must also exist 'particular facts' which show that consecutive sentencing is 'reasonably related to the severity of the offenses' and serves to protect society 'from further . . . aggravated criminal conduct.'" Id. at 461 (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Then, "[i]n order to limit the use of the 'dangerous offender' category to cases where such 'particular facts' exist, . . . sentencing courts must make specific findings regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4)." Id.

Here, the trial court made the following statements in determining the length of Defendant's sentences and whether to impose consecutive or concurrent sentencing:

> I do not find under the statute that I can find any enhancing or any mitigating factors to consider. That means in the case of aggravated rape that the sentence must be between 15 and 25 years for each count, but you have to find enhancing factors to go above 15, and in the aggravating kidnapping the sentence range is from 8 to 12 and again there are not aggravating circumstances.
>
> \*      \*      \*
>
> [A]fter hearing all the proof in the case I think at some point this defendant was going to kill this young lady till she talked him out of it. I think it's one of the most aggravated circumstance cases I've ever seen . . . I don't think the defendant had any hesitation, and I find that the factors in the other cases which apply to this section [40-35-115], the defendant's behavior indicated little or no regard for human life, he did not hesitate to commit a crime in which the risk to human life was high, and I find also that the circumstances surrounding the offense was aggravated. I find that confinement for an extended period of time is necessary to protect society. I find, based on the sentence that I am about to impose, that the aggregate length of the sentence reasonably relates to the offenses for which the defendant stands convicted. *For after all, if all of this had to run concurrently then there would be no punishment for kidnapping.* So I sentence the defendant to the minimum sentences for aggravated rape, 15 years, and order that those sentences run concurrent, that is, at the same time, and to 8 years for aggravated kidnapping, which I believe should run consecutively, and I so order.

(Emphasis added.)

First, we find that the trial court erred by ordering consecutive sentencing based on its finding that Defendant was a "dangerous offender." Under Lane, *prior to ordering consecutive sentencing under section 40-35-115(b)(4)*, the trial court must find that "*particular facts*" exist which show that consecutive sentencing is reasonably related to the severity of the offenses and that it serves to protect society from aggravated criminal conduct. Lane, 3 S.W.3d at 461 (emphasis added). The supreme court was quite clear in its mandate that sentencing courts must make *specific findings* regarding these criteria, i.e., the severity of the offenses and the necessity to protect society. In the case sub judice, the trial court stated what criteria it should find, but failed to state what specific facts it had found to satisfy them. A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences.

Second, it appears that the trial court erroneously considered a non-applicable factor in ordering consecutive sentencing, when it specifically stated that "if all of this had to run

concurrently, then there would be no punishment for kidnapping." This factor is not contained in the statutory criteria for sentencing purposes and is clearly inappropriate as a ground for ordering consecutive sentencing. Based on these errors, we cannot affirm the trial court's order regarding consecutive sentencing.

Our review reveals that the trial court ordered an appropriate sentence length for Defendant's conviction of aggravated kidnapping, but that it erred in determining that the proper length of Defendant's sentences for the aggravated rape convictions should be fifteen years. In cases where there are no enhancement or mitigating factors, the presumptive sentence for a Class B, C, D, or E felony shall be the minimum sentence in the range, and the presumptive sentence for a Class A felony is the midpoint of the range. See Tenn. Code Ann. § 40-35-210(c) (1997). Defendant was sentenced as a Range I standard offender for two convictions of aggravated rape, a Class A felony, and one conviction of aggravated kidnapping, a Class B felony. See id. §§ 39-13-304, 502. Under Tennessee law, as a standard Range I offender the applicable range for a Class A felony is fifteen to twenty-five years; the range for a Class B felony is eight to twelve years. See id. § 40-35-112(a)(1), (2). Thus, the midpoint of the sentence range, for a Range I standard offender convicted of aggravated rape, is twenty years. This is also the presumptive sentence. Where no enhancement or mitigating factors apply, as in the instant case, the result is a sentence of twenty years for each of the aggravated rape convictions. The sentence should not deviate from the presumptive sentence (the midpoint of the applicable range in this case), unless enhancement and/or mitigating factors are found by the trial court. See id. § 40-35-210(c) - (e). Here, no factors were applicable.

In summation, we conclude that the trial court did not consider the applicable sentencing considerations in Tennessee Code Annotated subsections 40-35-210(c) through (e) when it set Defendant's sentence of fifteen years for the aggravated rape convictions. Therefore, the sentence is not entitled to the presumption of correctness. It also appears that the trial court failed to make the necessary findings of fact in determining whether Defendant could be classified a "dangerous offender" and that it erroneously considered a non-applicable factor in ordering consecutive sentencing. Taking all of this into consideration, we are compelled to reverse Defendant's sentences for aggravated rape, and remand this to the trial court to impose sentences of twenty years for each aggravated rape. Furthermore, we remand this matter for a new sentencing hearing to determine whether or not consecutive sentencing is appropriate, in a manner consistent with this opinion.

**CONCLUSION**

For the forgoing reasons, we affirm all convictions and the sentence for aggravated kidnapping. We reverse the sentences imposed for aggravated rape and remand for the trial court to impose a sentence of twenty years for each aggravated rape. We further remand for a new sentencing hearing as to whether or not consecutive sentencing is appropriate, in a manner consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE