IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2019

**STATE OF TENNESSEE v. WHITCLIFFE MCLEOD**

**Appeal from the Criminal Court for Shelby County**
No. 16-06596     James M. Lammey, Judge

_____

**No. W2018-01646-CCA-R3-CD**

_____

The defendant, Whitcliffe McLeod, appeals his sentences for second degree murder and attempted second degree murder. The defendant argues the trial court abused its discretion in ordering the defendant to serve his sentences consecutively. Following our review, we affirm the judgments and sentence of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Harry E. Sayle III, Memphis, Tennessee, for the appellant, Whitcliffe McLeod.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

*A. Trial*

This case arises as a result of the murder of Aaron Forbes and the attempted murder of Andrea Williams-Forbes. Mrs. Williams-Forbes is the widow of Mr. Forbes. A Shelby County grand jury indicted the defendant for one count of premeditated first degree murder and one count of attempted premeditated first degree murder. The defendant went to trial on both counts. At trial, the parties presented the following proof:

Mrs. Williams-Forbes testified she drove to the home of her step-mother, Gloria Williams, on August 19, 2016. When she arrived, Ms. Williams was there with the defendant, and the defendant was drinking a glass of Jamaican rum. After a few hours, the three went to pick up Mr. Forbes from work. Then all four returned to Ms. Williams's house where Mr. Forbes, Ms. Williams, and the defendant started drinking alcohol.

At approximately 8:00 p.m., the victims and the defendant left Ms. Williams's house to go shopping at Wal-Mart. While shopping, Mr. Forbes picked up a t-shirt and asked Mrs. Williams-Forbes for her opinion on the shirt. She told Mr. Forbes the shirt was too small and he needed to "[g]et a bigger size." According to Mrs. Williams-Forbes, the defendant interjected and urged Mr. Forbes "don't let nobody tell you what to do. You're a guy. You're a gangster." Mrs. Williams-Forbes became upset and walked away. After a few minutes, she returned, and Mr. Forbes asked for her opinion on a pair of pants. She replied, "[m]y opinion doesn't matter" and again walked away. Seeing his wife upset, Mr. Forbes became angry and dropped the clothes. Mrs. Williams-Forbes testified the defendant again pressured Mr. Forbes, stating "[m]an, man, you don't let nobody tell you what to do. You're a gangster -- you're a gangster." The defendant picked up the clothes, and they walked to the register to check out.

When asked whether she observed any arguments between the defendant and Mr. Forbes inside of Wal-Mart, Mrs. Williams-Forbes testified she did not but stated the defendant and Mr. Forbes were "talking Jamaican." At trial, Mrs. Williams-Forbes identified a video which showed her, the defendant, and Mr. Forbes exiting Wal-Mart together. She walked immediately to the car, while the defendant and Mr. Forbes walked "somewhere else" before returning to the car. She testified the defendant and Mr. Forbes were talking before returning to the car, but she did not know what they were discussing. She also testified that when the defendant and Mr. Forbes returned to the car they were arguing and "cussing each other out." She did not know what they were arguing about.

After leaving Wal-Mart, they drove the defendant to his house, where he lived with his wife and his wife's children and grandchildren. Mrs. Williams-Forbes parked the car in front of the defendant's house. She testified the defendant and Mr. Forbes argued the entire drive, which was "[a]bout ten or fifteen minutes . . . ." When they arrived, the defendant exited the vehicle and walked inside the house. Mrs. Williams-Forbes briefly exited the car to remove a lawnmower from the back of the car. The lawnmower belonged to Ms. Williams; they were transporting it to the defendant's house because Ms. Williams was letting the defendant borrow it. After removing the lawnmower, Mrs. Williams-Forbes returned to the vehicle, secured her seat belt, and started the car.

Before the victims could leave, Mrs. Williams-Forbes saw the defendant outside of the house "with a gun," and he "beg[an] to start shooting us." When asked if she was sure the person she saw was the defendant, she stated, "[y]es, I'm positive." In an attempt to get away, Mrs. Williams-Forbes shifted the car into reverse before running into a mailbox. She then exited the vehicle in an attempt to save her life. She stated, "when I jumped out the car, [the defendant] ran the car down and emptied the gun on my husband." The defendant then walked over to Mrs. Williams-Forbes, who was lying in the street, and said, "Andrea, get up. Get up." Mrs. Williams-Forbes was unable to move because she had been shot. When asked whether Mr. Forbes carried a weapon, Mrs. Williams-Forbes stated he did not carry a weapon and never owned a gun.

Officer Edjuan Burriss, of the Shelby County Sheriff's Office, responded to the 911 call. When he arrived on the scene he saw Mrs. Williams-Forbes lying face down in the street. As he rendered aid to her, he noticed she was conscious but barely responsive. Officer Burriss testified, "[a]nd then at some point, my attention was directed to the white Jeep that was a few houses down on the west side of the street."[1] When he approached the Jeep, "it was pretty obvious that [the male victim] was already deceased." He checked for pulse and called for medical assistance. Medical personnel confirmed Mr. Forbes, who was seated in the front passenger seat, was dead. Officer Burriss also spoke to the defendant's wife that night. She told Officer Burriss she heard the defendant arguing with someone, and then she heard gunshots.

On cross-examination, defense counsel asked Officer Burriss about the lighting in the neighborhood where the shooting occurred. He testified, "Shelby County neighborhoods are dark. There isn't much lighting at night." When asked if there were any street lights at all, Officer Burriss stated, "No, ma'am."

The State next called Detective George Selby, of the Shelby County Sheriff's Office, who arrived on the crime scene at approximately 10:50 p.m. Detective Selby collected various pieces of evidence from the scene, such as a live nine-millimeter round, some shattered glass from the Jeep, and five spent nine-millimeter shell casings. He also identified bullet fragments he collected from the medical examiner's office, which were retrieved from Mr. Forbes's body during the autopsy. Detective Selby testified the shell casings were nine-millimeter shell casings, indicating the gun fired was a nine-millimeter pistol and was "[m]ore than likely, a semi-automatic."

Detective Selby further testified he was unable to locate a suspect while investigating the crime scene on the night of the shooting. However, investigators found

---

[1] The white Jeep was a Jeep Patriot owned and driven by Mrs. Williams-Forbes on the night of the shooting.

the defendant's phone in a wooded area, just one street over from where the shooting occurred.

The first time Detective Selby saw the defendant was on August 21, 2016, which was two days after the shooting. Detective Selby testified the defendant's wife, the defendant, and Ms. Williams, called him that day stating they were outside his office and prepared to surrender the defendant.

The State also called Sergeant Calvin Grantham, who worked as the crime-scene officer in the Shelby County Sheriff's Department in 2016. Sergeant Grantham, along with his team of investigators, arrived at the crime scene at approximately 9:30 p.m. on the night of the shooting. Sergeant Grantham testified they searched for a suspect that night but did not find one. While searching the defendant's house, they located a gun case for a Ruger nine-millimeter. The gun case was inside a suitcase which was in a closet in the master bedroom.

On cross-examination, defense counsel questioned Sergeant Grantham about the gun case. When asked about how the gun case was situated, he testified the suitcase was zipped shut and the gun case was lying unzipped inside the suitcase.

Next, the State called Detective Steve Bierbrodt, of the Shelby County Sheriff's Office, who obtained search warrants for the defendant's house and Mrs. Williams-Forbes's Jeep. Detective Bierbrodt testified he searched the Jeep and discovered three spent projectiles and three shell casings.

Agent Cervina Braswell, a forensic scientist for the Tennessee Bureau of Investigation, testified as an expert in firearms identification. Agent Braswell analyzed the seven bullets and eight cartridge casings found on the scene. She testified that all eight cartridge casings came from the same nine-millimeter semi-automatic pistol. She further testified that six of the seven bullets were all fired from a nine-millimeter semi-automatic pistol; the other bullet was too damaged to analyze. Agent Braswell could not ascertain whether the nine-millimeter gun that fired the bullets was the same nine-millimeter gun that ejected the casings because bullets and casings "are marked by two separate parts of the firearm . . . ." She would have needed the gun itself to make that determination. However, she testified, "being that they're from a semi-automatic pistol, if you have bullets that are one caliber, and you have cartridge cases from one caliber, then they could possibly have been fired from the same gun." She stated that it is possible the gun was a Ruger.

Doctor Paul Benson, an expert in forensic pathology, performed the autopsy on Mr. Forbes. He testified blood drawn from Mr. Forbes's body indicated a 0.019 percent

blood alcohol concentration level, which he said is "not very much." Blood tests also showed presence of marijuana, but the amount was "on the lower side . . . ." Lab tests did not reveal a presence of cocaine. Dr. Benson testified the cause of Mr. Forbes's death was multiple gunshot wounds.

Mrs. Williams-Forbes testified concerning her injuries, explaining that: half of her stomach and bowels were surgically removed; she is paralyzed from the waist down; she has to use a catheter on herself; she has blood clots in her lungs; and she is in pain twenty-four hours a day. She also testified that she takes oxycodone for her pain, iron pills due to blood loss, and Warfarin for her blood clots. As of the date of the trial, Mrs. Williams-Forbes had undergone over twenty surgeries and multiple blood transfusions, and she is unable to walk long distances on her own because of the bullet fragments in her spine. She testified these injuries are all a result of being shot by the defendant.

The defense called Jammsha Johnson, the defendant's step-daughter. Ms. Johnson lived with the defendant and was home with her mother at the time of the shooting. She testified she was lying in her bed reading when she heard somebody come inside the house. A few minutes later, she heard the defendant's voice but did not know what he said. After hearing the door open again, she walked to the door and saw her mother standing on the porch. She opened the door and recognized Mrs. Williams-Forbes's Jeep outside. As she stood on the porch with her mother, Ms. Johnson suddenly heard gun shots, but could not see anybody because it was dark. Ms. Johnson and her mother went back in the house for a moment and then walked towards the street, where they found Mrs. Williams-Forbes lying on the ground. Ms. Johnson called 911 and reported that somebody had been shot.

Ms. Johnson testified she did not see the defendant outside that night. When she did see the defendant the following evening, he "looked dirty." She denied having any issues with the defendant and stated she felt comfortable in the home. She also denied ever seeing any weapons in the home, including on the night of the shooting.

Ms. Williams, the step-mother of Mrs. Williams-Forbes and sister of the defendant, testified she saw the defendant at his house the day after the shooting. When asked about his appearance, she stated, "his arm was like somethin' bit him," and he had "a lot of cuts" on his arm. Two days after the shooting, Ms. Williams took the defendant to the police station to turn him over to authorities.

The defendant testified that he moved from Jamaica to America approximately eight months before the shooting. He and Mr. Forbes grew up together in Jamaica. The defendant's trial testimony regarding the events of August 19, 2016, was consistent with the testimony of Mrs. Williams-Forbes until he recalled the events that happened at Wal-

Mart. According to the defendant, he and Mr. Forbes did not have an argument that evening. He testified Mr. Forbes held up a suit at Wal-Mart and said he was going to buy it, at which point the defendant walked away. When the defendant returned to the clothing area, Mr. Forbes and Mrs. Williams-Forbes were arguing over whether Mr. Forbes should buy the suit. He further testified that when they left the store, Mr. Forbes and Mrs. Williams-Forbes had a "heated argument" about money for rent and utilities payments. According to the defendant, when they arrived at his house later, the defendant told Mrs. Williams-Forbes to stop arguing about the suit.

Once home, the defendant went inside to put away the items he had purchased at Wal-Mart. When he went back outside to help retrieve the lawnmower, the defendant heard "gunshots start to fire." The defendant claimed he saw "a man with a hoodie." The defendant then ran into the woods and stayed there all night because he was scared of the gunshots. He did not know Mr. Forbes and Mrs. Williams-Forbes had been shot until the day after the shooting.

When asked about the Ruger gun case found in his closet, the defendant stated he used the gun case to store money. He testified the suitcase was out of the closet that day because he took some money out of the gun case to go shopping. He claimed he did not know the Ruger case was a gun case and stated, "I don't know what is a Ruger." When asked if he owned a gun, the defendant stated, "No, and I don't want a gun." The defendant denied shooting Mrs. Williams-Forbes and Mr. Forbes.

After hearing the evidence, the jury convicted the defendant of lesser-included offenses of second degree murder and attempted second degree murder.

*B. Sentencing*

During the sentencing hearing, the State submitted as enhancing factors that "[t]he personal injuries inflicted upon . . . [Mrs. Williams-Forbes] [are] particularly great" and that the defendant "possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense." *See* Tenn. Code Ann. § 40-35-114(6),(9). The State recommended a sentence of twenty-four years for the second degree murder and twelve years for the attempted second degree murder, served consecutively. In turn, the defendant argued his sentence should be mitigated because he has no prior criminal record and he surrendered himself to authorities. *See* Tenn. Code Ann. § 40-35-113(13). The defendant requested a concurrent sentence of thirteen-and-a-half years.

The trial court accepted both enhancing factors submitted by the State, finding the personal injuries inflicted upon Mrs. Williams-Forbes particularly great and noting the defendant possessed a firearm during the commission of the crimes. The trial court

denied both mitigating factors submitted by the defendant. The court noted that, while the defendant had no prior criminal record, he only lived in the United States for eight months prior to the shooting. Further, the court found that while the defendant turned himself over to authorities, he did so only after hiding out and destroying the weapon. Lastly, the trial court determined the defendant's testimony at trial was untruthful, and he should not be rewarded with mitigating factors after lying under oath.

Next, the trial court considered the State's request for consecutive sentencing based on the State's belief that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life and had no hesitation about committing a crime to which the risk to human life was high . . . ." The trial court announced the following determination:

> I find that the circumstances surrounding the commission of the offense particularly aggravated. These are extraordinary circumstances. We have an argument over a shirt. And then [the defendant] shoots [Mr. Forbes] six times. And then he shoots [Mrs. Williams-Forbes] and permanently maims her for life. And then he lies under oath to get out of it.

> And, "[t]he aggregate length of the sentences reasonably relates to the offense for which the defendant stands convicted." It appears to [the court] that, of course, 13.5 [years] wo[u]ld be an insult to the decent law-abiding citizens of the state of Tennessee; and . . . it would be an insult to the surviving victim in this case. To have her husband killed . . . and then basically have the rest of [her] life ruined. These circumstances are particularly aggravating. I think consecutive sentencing is required under these circumstances.

Based on these facts, the trial court ordered the defendant's sentences be served consecutively for an effective sentence of thirty-six years: twenty-four years for the second degree murder and twelve years for the attempted second degree murder. The defendant filed a timely motion for a new trial which was denied on August 24, 2018. This appeal followed.

## ANALYSIS

This Court reviews within-range sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Further, in order to comply with the Sentencing Act, the trial court must

state on the record the statutory factors it considered and the reasons for the ordered sentence. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 705-06. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence, however, should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10; *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013).

It is well settled that the trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). One statutory criterion is a classification of the defendant as a "dangerous offender." Tenn. Code Ann. § 40-35-115(b)(4). A dangerous offender is one "whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Before imposing consecutive sentencing based upon the dangerous offender classification, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

On appeal, the defendant's sole focus is on the imposition of consecutive sentences. The trial court found the statutory criteria existed in the record to warrant consecutive sentencing based upon the dangerous offender classification. *See* Tenn. Code Ann. § 40-35-115(b)(4). The defendant, however, complains the trial court failed to support its decision to impose consecutive sentences. Specifically, the defendant argues "[t]here was no evidence to support a finding, and the [trial] court gave no indication, that the length of the sentence was necessary in order to protect the public from further criminal acts [by the defendant], as required by *Wilkerson* and *Pollard*." While the trial court could have articulated its application of the *Wilkerson* requirements more clearly, we hold that the trial court provided adequate reasons for imposing consecutive sentencing.

The trial court sufficiently outlined its reasoning pursuant to *Wilkerson*. In discussing the appropriateness of consecutive terms, the trial court made the following findings:

> I find that the circumstances surrounding the commission of the offense are particularly aggravated. These are extraordinary circumstances. We have an argument over a shirt. And then he shoots the victim six times.

- 8 -

And the he shoots the other victim and permanently maims her for life. And then he lies under oath to get out of it.

> And, "[t]he aggregate length of the sentences reasonably relates to offense for which the defendant stands convicted." It appears to me that, of course, 13.5 [years] would be an insult to the decent law-abiding citizens of the state of Tennessee; and . . . to the victim in this case. To have her husband killed . . . and then basically have the rest of [her] life ruined. . . . I think consecutive sentencing is required under these circumstances.

Additionally, the trial court considered the extraordinary circumstances surrounding the defendant's crimes, stating:

> They were at Wal-Mart, and they get in an argument about something -- about a shirt or something; and it's just -- and [the defendant] was telling the victim that he basically -- Mr. Forbes -- that he wasn't a man for letting his wife or his woman talk to him like that. That's basically it. I'm not sure exactly what the argument was; but it certainly didn't rise to the level of getting yourself shot six times.

These are appropriate findings in the record to support the trial court's decision that the first prong of *Wilkerson* was met.

In addition, while the trial court did not expressly state that consecutive sentences were "necessary in order to protect the public from further criminal acts," the record reflects that the trial court did consider the second prong of *Wilkerson*. The trial court's concern over the defendant's callousness of escalating a mere argument into a fatal shooting resulting in the death of one individual and life-long medical and physical issues for another, and subsequently lying to a jury about it, reflects a finding that consecutive sentencing was necessary to protect the public. *See State v. Demeko Gerard Duckworth*, M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *25 (Tenn. Crim. App. May 10, 2013), *perm. app. denied* (Tenn. Oct. 17, 2013) (the evidence supported a finding that the defendant was a dangerous offender where the defendant murdered one victim while her children were in the next room and later shot two additional victims at a separate residence); *State v. Howell*, 34 S.W.3d 484, 515 (Tenn. Crim. App. 2000) ("The circumstances of the crime, as they relate to the defendant . . . control the determination."). The trial court did not abuse its discretion in imposing consecutive sentences for the convicted offenses, and we affirm the trial court's sentence.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE